# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NICOLE WOOTEN,

    *Plaintiff*,

    *v.*                                       Civil Action No. ELH-23-2272

UNIVERSITY OF MARYLAND, BALTIMORE,

    *Defendant*.

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Nicole Wooten, who is Black, has sued her former employer, the University of Maryland, Baltimore ("University" or "UMB").[1] She alleges discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000-3 *et seq.* ("Title VII"), and the Maryland Fair Employment Practices Acts ("MFEPA"), § 20-601 *et seq.* of the State Government Article ("S.G.").[2] ECF 1 ("Complaint"). The suit is rooted, *inter alia*, in the University's decision to place plaintiff on a performance improvement plan and the subsequent decision not to renew plaintiff's teaching contract for its Physician Assistant Program.

UMB has filed a post-discovery motion for summary judgment (ECF 42), along with a memorandum (ECF 42-1) (collectively, "the Motion"). The Motion is supported by thirty-four exhibits. *See* ECF 42-4 through 42-37. Plaintiff opposes the Motion (ECF 47, "Opposition") and

---

[1] UMB is a public institution of higher education and a constituent institution of the University System of Maryland. *See* Md. Code (2025 Repl. Vol.), § 12-101(b)(6)(i) of the Education Article.

[2] Plaintiff also alleged claims for hostile work environment and retaliation. By Memorandum Opinion (ECF 15) and Order (ECF 16) dated May 1, 2024, I dismissed those claims.

has submitted twenty-two exhibits.  *See* ECF 47-3 through 47-24.  Defendant replied (ECF 53, "Reply") and provided four additional exhibits.  *See* ECF 53-7 through 53-10.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

### I. Factual And Procedural Background

Plaintiff was employed by the University as an Assistant Professor in the Physician Assistant Program ("PA Program," "Program," or "PAP") from August 5, 2019, until the expiration of her contract on June 30, 2022.  ECF 42-32 (Non-Renewal Letter), at 2; ECF 42-6 (Wooten Deposition), at 63–64.[3]  However, her teaching responsibilities were terminated on April 1, 2022.  ECF 47-4 (Wooten Declaration), ¶ 1; ECF 1, ¶ 24; ECF 42-32 at 2. The PAP was part of the University's School of Graduate Studies and, during plaintiff's employment, the Program operated in collaboration with Anne Arundel Community College ("AACC").  ECF 42-2 (Neumann Deposition), at 9.  Although the PA Program was located on AACC's campuses, the faculty and staff were employed by the University.  *Id.*

Pursuant to an Appointment Letter dated May 23, 2019 (ECF 42-7), plaintiff was appointed to the position of "Lecturer" on a 0.8 Full Time Equivalent ("FTE") basis.[4]  ECF 42-6 at 10.   The Appointment Letter is signed by Bruce Jarrell, MD, FACS, "Executive Vice President & Provost" as well as Dean of the Graduate School.  ECF 42-7 at 2.  Notably, it states, in part: "This is a non-tenure-track appointment and will end on June 30, 2020 unless renewed; renewal is at the

---

[3] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

[4] As an 0.8 FTE employee, plaintiff worked four days per week and carried 80% of a full-time workload.

discretion of the Graduate School." *Id.* at 2.  It appears that Wooten's contract was renewed at least once.[5]

A search committee that included both Cherilyn Hendrix and Theresa Neumann interviewed Wooten and recommended her for the position.  ECF 42-6 at 9; ECF 42-9 (Recommendation Letter), at 2.  Hendrix, who is White, was Assistant Dean for Physician Assistant Education, PA Program Director, and an Associate Professor.  ECF 1, ¶ 13; ECF 42-5 (Hendrix Deposition), at 6.  Hendrix was also plaintiff's supervisor.  ECF 1, ¶ 13.  Theresa Neumann, who is also White, was Assistant Director of the Program and the Academic Coordinator.  ECF 1, ¶ 14; ECF 42-2 at 11.

Plaintiff had no teaching experience.  ECF 42-9 at 2.  But, she was selected for the position because of her clinical background, which included nine years of experience as a physician's assistant. *Id.*  Plaintiff's responsibilities centered, *inter alia*, on teaching and advising students, developing curriculum, supervising labs, and evaluating student performance.  ECF 42-6 at 10; ECF 42-5 at 24–25.  Wooten initially worked at the AACC/UMB Collaborative PA Program location at the Arundel Mills Campus in Hanover, Maryland, and then at the PAP location on College Parkway in Arnold, Maryland.  ECF 47-4, ¶ 1.

To assist plaintiff with her transition to the University, UMB provided plaintiff with training, which "included coaching on simulation case design structure and the development of rubrics and case objectives" (ECF 42-8, ¶ 13) and "a session on writing course objectives, learning outcomes, and syllabus structure."  ECF 42-8, ¶ 12; ECF 42-5 at 53.  Kerry Birney, a colleague of plaintiff who is White, attended a New Faculty Workshop in 2019.  For reasons that are not clear,

---

[5] The parties do not discuss a contract renewal.  But, given that plaintiff's original appointment ended June 30, 2020, and plaintiff retained her position until June 2022, I deduce that the contract was renewed at least once.

Wooten did not attend.  ECF 42-6 at 67; ECF 42-5 at 16.  The Faculty Center also hosted "Lunch-and-Learn" sessions.  ECF 42-8, ¶ 5.  Faculty were made aware of the sessions by email.  *Id.*  The sessions featured faculty from the PAP, but were not specifically geared to the PA Program or new faculty.  *Id.*; ECF 47-4, ¶ 4.  Although there were other training and certificate courses offered by AACC and UMB, these were not specifically arranged for plaintiff.  ECF 42-6 at 67.

From the Fall of 2019 to the Spring of 2021, plaintiff taught a variety of courses.  These courses included Clinical Medicine 1, which she co-taught with Neumann and other faculty during the Fall of 2019 (ECF 42-5 at 8–9; ECF 42-6 at 17–19) and the Fall of 2020 (ECF 42-6 at 49); Clinical Medicine 1 Lab, which plaintiff taught during the Fall of 2019 and the Fall of 2020 (ECF 42-5 at 8–9; ECF 42-6 at 17–19; ECF 42-6 at 51); Psychiatric Medicine, a course that consisted of prerecorded lectures developed and taught by an adjunct faculty member, for which plaintiff answered students' questions and delivered two lectures of her own during the Fall of 2019 (ECF 42-5 at 8–9; ECF 42-6 at 19–21); Clinical Medicine 2, which plaintiff co-taught with Neumann and other faculty during the Spring of 2019 (ECF 42-6 at 38) and the Spring of 2021 (ECF 42-20); Patient Evaluation Lab, for which plaintiff had lab responsibilities during the Spring of 2019 (ECF 42-6 at 38) and the Spring of 2021 (ECF 42-21); Foundations of Physician Assistance Practice Course, which plaintiff taught during the Summer of 2020 (ECF 47-4, ¶ 17); Foundations of Physician Assistance Practice Lab, for which plaintiff had lab responsibilities during the Summer of 2020 (ECF 42-17); and Pediatrics, which was taught by adjunct faculty, but facilitated by plaintiff during the Fall of 2020 (ECF 42-6 at 50).

At the conclusion of courses, students complete course evaluations.  ECF 42-6 at 23.  Plaintiff's evaluations are docketed at ECF 42-10 (Fall 2019 Psychiatric Medicine Evaluations); ECF 42-11 (Fall 2019 Clinical Medicine 1 Evaluations); ECF 42-12 (Fall 2019 Clinical Medicine

1 Lab Evaluations); ECF 42-14 (Spring 2020 Clinical Medicine 2 Evaluations); ECF 42-15 (Spring 2020 Patient Evaluation Lab Evaluations); ECF 42-16 (Summer 2020 Foundations of Physician Assistant Practice Evaluations); ECF 42-17 (Summer 2020 Foundations of Physician Assistant Practice Lab Evaluations); ECF 42-18 (Fall 2020 Clinical Medicine 1 Evaluations); ECF 42-19 (Fall 2020 Clinical Medicine 1 Lab Evaluations), at 4; ECF 42-20 (Spring 2021 Clinical Medicine 2 Evaluations); ECF 42-21 (Spring 2021 Patient Evaluation Lab Evaluations).

Student evaluations are anonymous, and consist of several parts.[6]  Students are first asked to respond to a variety of statements, on a five-point scale, such as: "The instructor demonstrated knowledge of the course material"; "The instructor presented the course material in an effective manner"; The instructor showed concern for student learning;" "The instructor encouraged student participation"; "Give your instructor an overall rating".  *See* ECF 42-10 at 2–4; ECF 42-11 at 2–4; ECF 42-12 at 2–4; ECF 42-14 at 2–4; ECF 42-15 at 2–4; ECF 42-16 at 2–4; ECF 42-17 at 2–4; ECF 42-18 at 2–4; ECF 42-19 at 2–4; ECF-42-20 at 2–4; ECF 42-21 at 2–4.  The responses are compiled in a summary document.  *Id.*

Second, the scores are summarized by category, such as the number of students who responded, the "Institution-Wide Average," and the "Interpolated Median."  *Id.*  These reports also include a graph for each statement, demonstrating the score between one and five given by students in response to each statement.  To illustrate, the evaluation for 2019 Psychiatric Medicine (ECF 42-10 at 2), shows that fifteen students responded.  Out of those fifteen, one responded that the instructor demonstrated knowledge of the course material while six strongly disagreed.  Three others disagreed, and four neither agreed nor disagreed.  *Id.*

---

[6] The Court has been provided with summary documents that are based on individual student evaluations.  But, the individual evaluations were not submitted.  Although both sides reference the evaluations, neither side explains the methodology for them.

For each statement, the scores are averaged to calculate the "Course Average." The summary evaluations also provide the "Institution-Wide Average" for each statement, to allow for a comparison to the "Course Average."

An example from Fall 2019 Psychiatric Medicine (ECF 42-10 at 2) is helpful. To improve readability, I have reformatted and restated the information from the evaluation, as set forth below:

| **a.** The instructor demonstrated knowledge of the course material. | |
|---|---|
| Course Average | **2.20** |
| Institution-Wide Average | **4.67** |
| Course Standard Deviation | **1.26** |
| Institution-Wide Standard Deviation | **0.73** |
| Interpolated Median | **2** |
| Minimum Value | **1.00** |
| Maximum Value | **5.00** |
| Lowest Response | **1.00** |
| Highest Response | **5.00** |
| Response Count | **15** |



In addition, the evaluations pose questions to which the students can respond with written answers. ECF 42-10 at 6; ECF 42-11 at 6; ECF 42-12 at 6; ECF 42-14 at 6; ECF 42-15 at 6; ECF 42-16 at 6; ECF 42-17 at 6; ECF 42-18 at 6; ECF 42-19 at 6; ECF-42-20 at 6; ECF 42-21 at 6. For example, students are asked: "What did you like best about the instructor's teaching? Please give specific examples"; "Describe how the instructor's teaching can be improved. Please give specific examples". ECF 42-10 at 6; ECF 42-11 at 6; ECF 42-12 at 6; ECF 42-14 at 6; ECF 42-15 at 6; ECF 42-16 at 6; ECF 42-17 at 6; ECF 42-18 at 6; ECF 42-19 at 6; ECF-42-20 at 6; ECF 42-21 at 6.

The University has a "benchmark" of 3.5 for student evaluation scores. ECF 42-22 ("Hendrix Meeting Notes"), at 2.[7] Plaintiff acknowledged this "benchmark" at her deposition, stating that "professors [at the University] have a benchmark of at least hitting 3.5." ECF 42-6 at 34. Plaintiff exceeded the Program's benchmark rating of 3.5 only three out of eleven times for her scores in response to "[g]ive your instructor an overall rating for the course." ECF 42-10 at 4; ECF 42-11 at 4; ECF 42-12 at 4; ECF 42-14 at 4; ECF 42-15 at 4; ECF 42-16 at 4; ECF 42-17 at 4; ECF 42-18 at 4; ECF 42-19 at 4; ECF-42-20 at 4; ECF 42-21 at 4. Moreover, plaintiff repeatedly received scores from students that were below the Institution-Wide Average. *Id.*

The student evaluation comments for each of plaintiff's lecture courses were generally critical of plaintiff's teaching style and demeanor. *See, e.g.*, ECF 42-14 at 6–9; ECF 42-15 at 6–9; ECF 42-18 at 6–9; ECF 42-19 at 6. Students' comments for plaintiff's lab courses were more mixed. For example, for the Foundations of Physician Assistant Practice course, in which plaintiff taught five students, the students acknowledged that plaintiff tried to explain concepts to support

---

[7] The parties do not dispute the benchmarks or the institution-wide averages. But, neither party explains how these scores are computed, where they may be found, or what they mean.

their understanding, but they also observed that she appeared uncomfortable teaching the course and struggled with the lecture portion of the class.  ECF 42-17, ¶¶ 5, 8, 10, 13.

In the Summer of 2021, Hendrix began to express concern to plaintiff about the consistent negative feedback.  ECF 42-5 at 34 (Hendrix Deposition).  She also began to keep notes.  *See* ECF 42-22.  At her deposition, Hendrix explained why she kept notes, stating: "Because you learn over time when you have an insubordinate employee who doesn't want to follow direction and is having difficulty, you start documenting everything."  ECF 42-5 at 34.

According to Hendrix, she met with plaintiff several times to discuss plaintiff's need for improvement.  *Id.* at 2–4.   At a meeting on July 2, 2021, Hendrix asked plaintiff, *inter alia*, to enroll in a course on communication, refrain from becoming defensive, adjust her teaching style, watch and evaluate one of Hendrix's lectures, and attend the Physician Assistant Education Association ("PAEA") Faculty 101 Workshop.  *Id.* at 2–3.  Hendrix also arranged for Susann Galloway, a visiting professor, to mentor plaintiff.  *Id.* at 3.  However, plaintiff felt that Hendrix was unsupportive during the meeting of July 2, 2021.  In a Declaration dated August 25, 2025 (ECF 47-4), she states: "Dr. Hendrix was not supportive at all, to include demanding I work all five days contrary to my initial work arrangement."  *Id.* ¶ 21.

Hendrix appointed Neumann as course director for Clinical Medicine 1 during the Fall semester of 2021, and plaintiff assumed the role of lab coordinator.  *See* ECF 42-23 ("August 25, 2021 Email Chain"); ECF 42-5 at 43.  Hendrix and Neumann arranged the course with the idea that plaintiff could learn from Neumann's teaching. ECF 42-5 at 17; ECF 42-23 at 3.  Regarding Clinical Medicine 1, Neumann wrote to Wooten on August 25, 2021, and said, in part, ECF 42-23 at 3:

> [P]lease pick 1-2 hours of content . . . to deliver for Derm (1 hour each day), Eye (1 hour), and ENT (1 hour); I will be delivering the rest while you learn.  Please do

not give a quiz during the 1st hour; your goal is to deliver content.  If you want to schedule a post-lecture, non-graded quiz, please send me the content for review.  I will be evaluating your teaching and giving you constructive criticism to help you improve.

Plaintiff replied: "I am not trying to be a problem. But if you have changed by responsibilities and I am no longer teaching these lectures as discussed. Why did I have to switch my day off? 1 hour lectures can be done on Wednesday. My lab day was Tuesday." *Id.* at 2.

Two days later, following a meeting concerning plaintiff's performance, Hendrix emailed Neumann and Wooten regarding the content plaintiff was expected to deliver for Clinical Medicine 1. ECF 42-24 ("August 27, 2021 Email Chain").  Hendrix wrote, *id.* at 2–3:

> Nicole and Theresa, I am following up on my meeting yesterday afternoon and want to let you both know I have completed my investigation regarding the changes in the MSPA 512 course. As you both are well aware, I would be very disturbed to find major changes this late in course development. In my thorough investigation over many days, I failed to discover any. I found only small tweaks that were directed to better facilitate learning and create more consistent instruction while taking the entire semester and all courses being taught into consideration. Tweaks here and there to a course follow a typical process- there is nothing wrong with small changes that are just that- tweaks to improve the overall flow and content of the course. Remember, this course and lab are one. They are not separate entities and will not be treated as such. Negativity and accusations revolving [sic] this course and faculty assignments will stop immediately.

> Theresa is the course director for MSPA 512. Everyone who is assigned to this course and its labs will follow Theresa's direction without argument. However, because I am program director and have overall responsibility for this entire program, I have decided the two of you will not interface with one another in this course. Colleen, our academic coordinator, has agreed to work with you Nicole; she will take Theresa's direction and inform you, and you will carry out that direction without argument. You will not interface with Theresa during this course's duration.

> I also want to make sure the chain of command in this program is fully understood and followed. Any time a faculty member is designated as the course director, all instructors, regardless of their role in that course, be it lab or lecture responsibilities, will follow the direction of the course director. Theresa is also the Assistant Program Director of this PA program who has been fully vetted, interviewed, nominated by a search committee, and selected by UMB Graduate School leadership. I have given her very specific areas of the program for which to lead and be responsible, and she has done an outstanding job. When she gives direction,

she does so using her extensive years of clinical and didactic expertise, years of teaching graduate-level education, specialty areas of focus and knowledge of ARC-PA standards. Her direction will be followed.

I am not only the Assistant Dean for Physician Assistant Education, but program director and supervisor of every staff, faculty, adjunct faculty and affiliate faculty in this program. My direction will be followed without argument. I will not tolerate insubordination, accusations, bullying or negativity of any kind. I forwarded Ombuds and Workforce Mediation links to you both to utilize if you so desire.

On September 1, 2021, Galloway performed an informal evaluation of plaintiff's teaching, which resulted in a score of 20 out of 40. ECF 42-26 (Teaching Effectiveness Evaluation), at 2; ECF 42-27 (Galloway Deposition), at 8. Galloway commented that Wooten's teaching style lacked energy and engagement with the students. ECF 42-26 at 2.

Plaintiff, Hendrix, and Kimberlee Bizzell, a Medical Director at the University, met on October 6, 2021. ECF 42-6 at 55. At that time, the University placed plaintiff on a Performance Improvement Plan. *See* ECF 42-28 ("PIP"); *see also* ECF 42-6 at 55. The PIP set forth various areas of improvement for plaintiff and benchmarks for her performance. ECF 42-28 at 2. In addition, Bizzell was assigned as a mentor to plaintiff. ECF 47-4, ¶ 5.

A meeting followed on October 25, 2021, attended by plaintiff, Hendrix, and Vice Dean Flavius Lilly. ECF 42-29 (Lilly Affidavit). Plaintiff indicated that she had not reviewed the student evaluations. ECF 47-6 at 50. At her deposition, she recalled, *id.*: "I told [Lilly] I didn't fully look at them all." In Lilly's Affidavit of July 7, 2025, he avers that he "found this lack of awareness troubling" because "[s]tudent evaluations are available to faculty through an electronic system, and faculty are expected to review their evaluations and work to correct identified weaknesses." ECF 42-29, ¶ 7. He recommended a follow-up meeting to provide plaintiff with time to review the student feedback. *Id.*

Plaintiff and Lilly met again on November 3, 2021. *Id.* ¶ 8. Lilly avers that plaintiff "did not demonstrate meaningful insight into the evaluations or take responsibility for the concerns raised. Instead, she suggested that her supervisor held her to higher standards than her colleagues, citing perceived differences in scheduling flexibility, instructional support, and supervision." *Id.* But, Lilly disagrees that plaintiff was held to more rigorous standards, stating, *id.* ¶ 9: "By [plaintiff's] own account, the support she received was consistent with, and in many ways exceeded, the support provided to other faculty members. Despite these efforts, there was no discernable improvement in her instructional performance." Lilly claims that they "concluded the meeting with the understanding that Ms. Wooten would continue working with her supervisors to improve" her teaching performance. *Id.*

Plaintiff requested another meeting with Lilly and Hendrix, which was held on December 3, 2021. *Id.* ¶ 10. Lilly recalls that initially they focused on improvement strategies, but it "quickly shifted to Ms. Wooten's dissatisfaction with her instructional support, work schedule, and relationship with her supervisor." *Id.* ¶ 11. He avers, *id.* ¶ 12: "I found that her concerns lacked objective support. Instructional guidance appeared to be provided as needed, and her teaching schedule was consistent with standard scheduling practices." He continues, *id.*: "Although [plaintiff's] relationship with her supervisors appeared to be strained, I perceived the underlying cause to be legitimate oversight and feedback related to her performance."

Moreover, in his Affidavit, Lilly recalls that, during the meeting on December 3, 2021, "Wooten became irate and screamed at [Lilly], accusing [him] of not listening." *Id.* ¶ 13. He states, *id.*: "I explained that my difference of opinion was not indicative of a lack of listening, and reminded her that professional civility is expected. I also reiterated that my conclusions were based on the information she provided to me."

Further, Lilly recalls in his Affidavit that, sometime "after the third meeting," which took place on December 3, 2021, he "met with Dr. Hendrix to discuss Mr. Wooten's employment." *Id.* ¶ 14.  During the meeting, "it was determined that the situation was untenable and that the nonrenewal of Ms. Wooten's contract was the appropriate course of action."  *Id.*; *see* ECF 42-5 at 52.  Therefore, on April 1, 2022, the University informed plaintiff, in writing, that her contract would not be renewed.  ECF 42-6 at 63; ECF 42-32 (Non-Renewal Letter), at 2.

In the Non-Renewal Letter to Wooten, Lilly wrote, in part, *id.*:

> Your current appointment as Graduate School Assistant Professor on the non-tenure track in the Graduate School expires on June 30, 2022.  As required by the Graduate School Policy for Faculty Appointment and Promotion, this letter serves to notify you that your appointment will not be renewed.

> Effective immediately, you are being given an at home assignment and will not be required to report to campus or access campus systems.  Dr. Cheri Hendrix will provide you with the details.  This assignment will end on or before June 30, 2022.

Plaintiff was paid by the University through June 30, 2022.  ECF 42-6 at 63–64.  As noted, that was the date of expiration of her contract.

In response to a request for admission from defendant, Wooten indicated that she first contacted "the Equal Employment Opportunity Commission or any Fair Employment Practices Agency regarding [her] employment with Defendant . . . on April 2, 2022."  ECF 53-7 ("Plaintiff's Response to Requests for Admission"), at 3.   On May 11, 2022, plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights ("MCCR").   ECF 42-34 (the "Charge").   The MCCR then "crossfiled" the Charge with the Equal Employment Opportunity Commission ("EEOC").  ECF 1, ¶ 5.

In the Charge, plaintiff alleged that, between August 5, 2019, and April 1, 2022, the University discriminated against her on the basis of race. ECF 42-34 at 2.  Plaintiff stated, *id.*:

> I. I was employed by the above named Respondent since August 5, 2019; I was an Assistant Professor.  Upon hire, I was subjected to stricter work conditions with

12

less support by supervisor Cherilyn Hendrix and Assistant Program Director Theresa Neumann, compared to white employees. During this time, I was also subjected to constant criticism on my work performance by Neumann. Throughout my employment, I reported to Respondent about this treatment but received no assistance. On April 1, 2022, I was discharged. II. Respondent explained that I was terminated for poor work performance. No explanation was provided for the other treatment to which I was subjected. III. I believe I was discriminated against due to my race (black) with regards to terms and conditions, harassment and discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended.

The EEOC issued a Notice of Right to Sue on May 22, 2023. *Id.* This suit followed on August 18, 2023. ECF 1. The Complaint (ECF 1) contains five counts: Discrimination on the basis of race, in violation of Title VII (Count I); retaliation, in violation of Title VII (Count II); discrimination on the basis of race, in violation of MFEPA (Count III); retaliation, in violation of MFEPA (Count IV); and hostile work environment, in violation of Title VII (Count V).

Pursuant to Fed. R. Civ. P. 12(b)(6), defendant moved for "partial dismissal" of the Complaint. ECF 8, ECF 8-1. Specifically, the University sought to dismiss Counts II, IV, and V. By Memorandum Opinion (ECF 15) and Order (ECF 16) of May 1, 2024, I granted the motion. In particular, I noted that plaintiff did not allege retaliation in her Charge and thus did not meet exhaustion requirements. Moreover, plaintiff failed adequately to allege that her treatment "was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *See Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 716 (4th Cir. 2024).

Additional facts are set forth, *infra*, in the context of the discussion of the issues.

## II.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact that precludes the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322–24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).  Rather, "there must be evidence on which the jury could reasonably find for the nonmovant."  *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

In other words, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  But,

where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations. *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658–59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). On the other hand, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of

"'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 n.8 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

But, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). Rather, "to avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (citations omitted).

### III. Discrimination Claims (Counts I and III)

#### A. Title VII

Title VII prohibits an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," and from "limit[ing], segregat[ing], or classify[ing] . . . employees or applicants from employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "These two proscriptions, often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); *see Young v. United Parcel Servs., Inc.*, 575 U.S. 206 (2015); *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).

The Supreme Court has referred to discrimination based on one of the five characteristics specified above—race, color, religion, sex, or national origin—as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). Moreover, the phrase "terms, conditions or privileges of employment" is regarded as "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Here, plaintiff alleges disparate treatment. Notably, "'[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)) , *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.* 557 U.S. 167 (2009).

At trial, a plaintiff may establish a discrimination claim "through two avenues of proof." *Hill*, 354 F.3d at 284. The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas v. Delmarva Power & Light Company*, 715 F. App'x 301, 302 (4th Cir. 2018). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 575 U.S. at 213 (construing the Pregnancy Discrimination Act); *Massaro v. Fairfax Co.*, 95 F.4th 895, 902 (4th Cir. 2024); *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021).

The *McDonnell Douglas* proof scheme is merely "a procedural device, designed only to establish an order of proof and production" *at trial*. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted); *see Ennis v. National Ass'n of Business and Educational Radio,*

18

*Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)).  It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  But, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

Of course, this case is at the summary judgment stage, not trial.  Nevertheless, the elements of the proof scheme are helpful in evaluating the evidence.  *Hux v. City of Newport News, Va.,* 451 F.3d 311, 315 (4th Cir. 2006).  As the Fourth Circuit has stated, *id.*:  "The summary judgment standards mesh comfortably with the *McDonnell Douglas* framework."

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intel. Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  To establish a prima facie case of disparate treatment under Title VII, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Cosby,* 93 F.4th at 714 (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)); *see Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018); *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015).

The Supreme Court has clarified that "[t]he prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.'" *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  "'Rather, it is merely a sensible, orderly way to evaluate the

evidence in light of common experience as it bears on the critical question of discrimination.'" *Id.* (quoting *Furnco Construction Corp.*, 438 U.S. at 577).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, nondiscriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11. Put another way, "[w]here a defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case," by establishing a nondiscriminatory reason for the adverse action, "whether the plaintiff did [make a prima facie case] is no longer relevant." *Aikens*, 460 U.S. at 715 (alteration added).

At trial, if the defendant establishes a nondiscriminatory reason for an adverse action, the burden shifts to the plaintiff to prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *see also Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in *Adams* and *Jiminez*). In other words, even under the *McDonnell Douglas* approach, the

"'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle*, 650 F.3d at 336.

The *McDonnell Douglas* proof scheme is "a 'pretext' framework, under which the [plaintiff], after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination."  *Hill*, 354 F.3d at 285 (citing *Burdine*, 450 U.S. at 252–53 and *McDonnell Douglas Corp.*, 411 U.S. at 807).  "To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were 'unworthy of credence' and (2) unlawful discrimination was the actual motive for the decision."  *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 573 (D. Md. 2010) (quoting *Reeves*, 530 U.S. at 143); *see Congress v. Gruenberg*, 643 F. Supp. 3d 203, 230 (D.D.C. 2022) ("A plaintiff may make this showing of pretext by relying on '(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.'") (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

A plaintiff may introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006).  But, "[o]nce an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising

points that are wholly irrelevant to it. The former would not create a "'genuine' dispute, *see Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, [and] the latter would fail to be 'material,' *see Anderson,* 477 U.S. at 248." *Hux*, 451 F.3d at 315.

Moreover, in assessing a defendant's proffered reasons for its actions, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations and citation omitted).

Generally, in evaluating whether a plaintiff has met the legitimate expectations of her employer, "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (quoting *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996), *cert. denied,* 540 U.S. 1073 (2003)); *see*, *e.g.*, *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Baltimore Cnty.,* 162 F.4th 101, 107 (4th Cir. 2025); *Giles v. Nat'l R.R. Passenger Corp.,* 59 F.4th 696, 704 (4th Cir. 2023); *McKinney v. Cleveland Cnty. Bd. Of Educ.*, 2023 WL 4637115, at *4 (4th Cir. July 20, 2023); *Hill v. Southeastern Freight Lines, Inc.*, 523 F. App'x 213, 216 (4th Cir. 2013) (per curiam); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 (4th Cir. 2009) (per curiam); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 363 (4th Cir. 2005) (per curiam). But, in *Sempowich*, 19 F.4th at 650, the Fourth Circuit said: "[A]lthough we have held that we must focus on the employer's perception in the context of the *pretext* stage, we have not so held with respect to a plaintiff's prima facie case." (Citations omitted, italics in *Sempowich*).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must show only that he was qualified for the job

and that he was meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019); *see Sempowich*, 19 F.4th at 649–50.

With regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing v. Brivo Systems, LLC,* 959 F.3d 605, 616 n.8 (4th Cir. 2020)); *see Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)). However, the employee suffering the adverse action "does not have to show . . . that the harm incurred was 'significant'. . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024) (citation omitted).

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill*, 41 F.4th at 384; *McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016); *Bryant v. Bell Atlantic, Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).[8] To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of when "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); s*ee Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009); *Bush v. Frederick Cnty. Pub. Schs.*, No. 23-1127, 2024 WL 639255, at *3 (4th Cir. Feb. 15, 2024) *Williams*, 370 F.3d at 428. This period is extended to 300 days in a deferral state, such as Maryland. *See Jones*, 551 F.3d at 300; *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 439 (4th Cir. 1998); *Bush*, 2024 WL 639225, at *3; *Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425,

---

[8] As discussed, *infra*, the same is true under MFEPA. *See Bush*, 2024 WL 639255, at *3 ("Both Title VII and the [MFEPA] require a plaintiff alleging employment discrimination to exhaust administrative remedies before filing their lawsuit, or else the claim is time barred.").

at *4 n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

Moreover, "a complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed." *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 545 (2019) (citing § 2000e-5(f)(1); 29 CFR § 1601.28). "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer." *Fort Bend Cnty.*, 587 U.S. at 545 (citing § 2000e-5(f)(1)).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted). It "'ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.'" *Cowgill*, 41 F.4th at 384 (citation omitted). If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit. *See*, *e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant*, 288 F.3d at 132.

However, exhaustion is not jurisdictional. It is, instead, a "claim-processing rule[] that must be timely raised to come into play." *Fort Bend Cnty.*, 587 U.S. at 544. A defendant may waive arguments related to administrative exhaustion. But, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6). *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Fort Bend Cnty.*).

Although administrative exhaustion is not jurisdictional, the exhaustion process has substantive effect. Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans*, 80 F.3d at 963. Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," they must be construed "with utmost liberality." *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) (citation omitted); *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat.*

*Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Cowgill*, 41 F.4th at 384; *Stewart*, 912 F.3d at 705.

## B. MFEPA

MFEPA "is the state law analogue of Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007). S.G. § 20-606(a)(1) specifies, in pertinent part, that "an employer may not . . . (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's . . . race . . . ."

"There are relatively few appellate decisions interpreting Maryland's FEPA," so courts in the State have been guided by federal courts' interpretation of Title VII to analyze claims under the state's analogue law. *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 209, 137 A.3d 211, 217–18 (2016); *see Schwenke v. Ass'n of Writers & Writing Programs,* 510 F. Supp. 3d 331, 335 (D. Md. 2021). Maryland courts interpreting MFEPA have found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766, 772 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013).

Indeed, Maryland courts are permitted to "interpret the MFEPA consistent with its federal corollary, absent 'legislative intent to the contrary[.]'" *Doe v. Cath. Relief Servs.*, 484 Md. 640, 680–81, 300 A.3d 116 (2023) (citation omitted) (alteration in original). Moreover, a claim under MFEPA may be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Dobkin v. Univ. of Balt. Sch. of L.*, 210 Md. App. 580, 592, 63 A.3d 692, 699 (2013) ("In the absence of direct evidence, Maryland Courts have traditionally held that in employment discrimination

actions, parties must engage in the four-part burden-shifting paradigm described by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).")

Moreover, MFEPA incorporates the exhaustion procedures of Title VII, 42 U.S.C. §§ 2000e *et seq.  See Alexander*, 2011 WL 1231029, at *6 (referring to MFEPA as "the state law analogue of Title VII."); *see also* 42 U.S.C. § 2000e-5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter).  Thus, MFEPA requires a plaintiff to exhaust administrative remedies prior to filing suit in court.  *See Bush.*, 2024 WL 639255, at *3 ("Both Title VII and the [MFEPA] require a plaintiff alleging employment discrimination to exhaust administrative remedies before filing their lawsuit, or else the claim is time barred."); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (Title VII); *Johnson v. United Parcel Serv., Inc.*, No. CIV.A. RDB-14-4003, 2015 WL 4040419, at *6 (D. Md. June 30, 2015) (concluding that MFEPA requires administrative exhaustion prior to filing suit).

## IV. Discussion

### A.

The University argues that it is entitled to summary judgment because plaintiff has not adduced sufficient evidence to establish a prima facie case of race discrimination. ECF 42-1 at 17. ECF 42-1 at 17.  In any event, UMB contends that the undisputed evidence establishes that the University's actions were supported by legitimate, nondiscriminatory, and non-pretextual reasons. *Id.*

As to Wooten's failure to establish a prima facie case of race discrimination, UMB contends that Wooten did not show that she experienced an adverse employment action; that she was fulfilling the University's legitimate expectations at the time of an alleged adverse action; or

that similarly situated employees outside the protected class were treated more favorably. *Id.* at 20. Further, defendant claims that some of Wooten's discrimination claims are "time-barred" and cannot be considered as adverse actions because she did not file a discrimination claim within 300 days of the alleged unlawful employment practice. *Id*. at 21. Defendant also argues that, even if Wooten could establish a prima facie case of race discrimination, the University's actions and its decision not to renew plaintiff's contract were motivated by legitimate, nondiscriminatory reasons. *Id.* at 29. And, according to UMB, plaintiff has produced no evidence demonstrating that these reasons were pretextual. *Id*.

Plaintiff insists that she "has presented facts to state a prima facie case of discrimination and that genuine disputes of material fact exist," so as to require denial of the Motion. ECF 47 at 5. According to plaintiff, she "suffered a series of adverse employment actions," *id*., ranging from insufficient job support and training to the non-renewal of her contract. *Id*. at 26. Moreover, she asserts that she met all legitimate job expectations. *Id.* Further, Wooten contends that similarly situated employees outside of the protected class, including Birney, Colleen Ohm, and Teresa Rogers, were treated more favorably than plaintiff. *Id.* at 28. Moreover, plaintiff claims that the University has not offered legitimate, nondiscriminatory reasons for the non-renewal of plaintiff's contract. *Id.* at 33. To the contrary, plaintiff posits that the University's actions are demonstrably pretextual. *Id.* In addition, plaintiff argues that the Court "retains discretion . . . to equitably toll the statutory deadline." *Id.* at 25.

In particular, the parties dispute: (1) whether the limitations period covers the period of employment before July 15, 2021; (2) the alleged adverse employment actions; (3) whether plaintiff was meeting the University's legitimate performance expectations; (4) whether the

comparators identified by plaintiff are similarly situated for purposes of demonstrating disparate treatment; and (5) whether the University's actions were pretextual.

**B.**

As noted earlier, in a deferral State, such as Maryland, a plaintiff must file a charge of discrimination within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 20003-5(e)(1); *Bush*, 2024 WL 639225, at *3. Defendant contends that because "Ms. Wooten first filed her charge of discrimination on May 11, 2022 [ECF 42-34], only acts occurring on or after July 15, 2021, are actionable." ECF 42-1 at 21. UMB states, *id.*: "Allegations predating this cutoff—including claims regarding workshop attendance, reassigned courses, reprimands, and lack of support from 2019 to mid 2021—are untimely and cannot support her claims."

Plaintiff agrees that an employee must file a charge within 300 days of the alleged unlawful employment practice. ECF 47 at 24. Yet, she seems to suggest that she did so on April 2, 2021. *Id.* at 25. Plaintiff argues that "300-days before April 2, 2021 is June 6, 2020," and therefore, "all the acts occurring on or after June 7, 2020 are actionable." *Id.* In any event, she argues that the court retains discretion to equitably toll the statutory deadline. *Id.*

To the extent that Wooten suggests in her Opposition that she filed her Charge on April 2, 202**1** (ECF 47 at 25), she is in error. There is no evidence that demonstrates that Wooten had any contact with a State agency or the EEOC in 2021. Indeed, plaintiff has expressly admitted to defendants in Plaintiff's Response to Requests for Admissions that the first time she contacted "the Equal Employment Opportunity Commission or any Fair Employment Practices Agency regarding [her] employment with Defendant was on April 2, 202**2**." ECF 53-7 at 3 (emphasis added). But, neither side provides any evidence demonstrating the nature of plaintiff's contact with an agency

on April 2, 2022.  Nevertheless, I shall assume that plaintiff contacted an appropriate agency on April 2, 2022, such that it is the operative date to resolve issues of timeliness.

Wooten cites *Lee v. Mattis*, PX-17-2836, 2018 WL 3439261 (D. Md. July 17, 2018), to justify her effort to enlarge the timeline.  *See* ECF 47 at 25.[9]  The *Lee* Court found that "the intake questionnaire is sufficient to preserve all claimed misconduct occurring in the 300 days prior to its filing."  *Id.* at 7.  The court reasoned, *id.*: "Lee identifies the basis for her claims and what remedial action is sought, and she verifies each form included with the intake questionnaire."  However, the court also recognized: "Not every completed Intake Questionnaire is considered sufficiently detailed to constitute a charge."  *Id.* (citing *Merchant v. Prince George's Cty., Md.*, 948 F. Supp. 2d 515, 522 (D. Md. 2013)).  The court explained that, to determine if other material may stand in for a Title VII charge, "the Court must examine the specific document submitted 'from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes.'"  *Id.* (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)).

In its Reply, defendant recognizes that Wooten seeks "to enlarge the limitations period by invoking cases where an EEOC intake questionnaire was deemed sufficient to constitute a charge."  ECF 53 at 4.  However, defendant points out that there is no "pre-charge submission [here that] satisfied the applicable standard."  *Id.*  Indeed, plaintiff has not provided an intake questionnaire for the Court, or a description of such a form, or even an argument that she provided enough information to the agency to substitute for a charge.  *See* ECF 47 at 25.

---

[9] Plaintiff provided a "Table of Authorities", ECF 47 at 3–4, but did not include *Lee* in the Table.

Nevertheless, plaintiff maintains that "[t]he court retains discretion . . . to toll the statutory deadline."  ECF 47 at 25 (citing *Olson v. Mobil Oil Corp.,* 904 F.2d 198, 201 (4th Cir. 1990)). However, the *Olson* Court indicated that the limitations period will not be tolled "unless an employee's failure to timely file results from either a 'deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'"  *Id.* (citing *Price v. Litton Business Sys., Inc.,* 694 F.2d 963, 965 (4th Cir.1982)). Plaintiff provides no claim or evidence regarding the applicability of this exception.  *See* ECF 47 at 25.

Assuming that Wooten contacted an appropriate agency on April 2, 2022, any disparate treatment claims involving conduct that occurred more than 300 days prior to April 2, 2022, are untimely.  *See Perkins v. Int'l Paper Co.,* 936 F.3d 196, 207 (4th Cir. 2019).  Wooten's claims of disparate treatment may proceed "only on deliberate discrimination that occurred within the 300 days of filing [the] charge." *Id.* at 207.  Thus, the limitation period for the discrimination claims begins on June 6, 2021.

Several of plaintiff's claims of adverse employment action predate June 6, 2021.  These include alleged deprivation of training for plaintiff in the Fall of 2019, ECF 1, ¶ 76; schedule and content changes with plaintiff's Spring courses in 2020, *id.* ¶ 77; and the teaching assignment of the Foundations of Physician Assistant Practice, referred to as PHA 105, in the Summer of 2020, *id.* ¶ 78.

## C.

In Count I of the Complaint, plaintiff broadly refers to "the aforementioned acts of discrimination."  ECF 1, ¶ 53.  In her Opposition, plaintiff claims that she "was deprived of training, guidance and feedback necessary to succeed." ECF 47 at 26.  Most of the workshops that

plaintiff complains of not attending occurred before June 2021, however.    Therefore, her contention as to them is time-barred.  ECF 47-6 at 69.  She also complains that she "was forced to work on her day off and told to work 5 days a week instead of her contracted 4."  *Id.*  In addition, plaintiff posits that she was "reprimanded for attending a funeral of a relative" and "written up for trying to defend herself against Ms. Neumann."  *Id.*  In addition, plaintiff contends that "[h]er lecture hours were cut down."  *Id.*  She also asserts that defendant "condoned students using racially motivated slurs against her."  *Id.*  Of import, plaintiff also claims that she was placed on a "baseless PIP and ultimately her contract was not renewed."  *Id.*

UMB argues that, with respect to the qualifying period, which defendant states is the period following July 15, 2021, few of plaintiff's allegations qualify as adverse employment actions.  ECF 42-1 at 21. Defendant asserts, *id.* at 22: "Ms. Wooten's allegations—while reflecting discontent with her supervisors and workload—do not meet the standard for an adverse employment action, as she has not shown that she was left 'worse off' in any respect that affected an identifiable term or condition of her employment."    Defendant continues, *id.* at 23: "Because Ms. Wooten's allegations reflect professional dissatisfaction, not discriminatory treatment, they cannot serve as the basis for her discrimination claims."    However, defendant acknowledges that, "to the extent Ms. Wooten is alleging that the nonrenewal of her contract or her placement on the PIP were the result of intentional discrimination . . . these occurrences constitute adverse actions under the applicable law."  *Id.*

Both plaintiff and defendant point to the Supreme Court's ruling in *Muldrow*, 601 U.S. 346 to support their arguments.  There, the Supreme Court stated, *id.* at 354–55: "To make out a Title VII discrimination claim, a[n] [employee] must show some harm respecting an identifiable term or condition of employment."  However, the Court also said, *id.* at 355: "What the [employee]

does not have to show, according to the relevant text, is that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."

To "rise to the level of an adverse employment action absent termination, the misconduct must be more than something that offends the employee, and instead must materially alter 'the terms, conditions, or benefits' of the plaintiff's employment." *Credle v. Virginia Cmty. Coll. Sys.*, DJN-24-233, 2025 WL 27827, at *7 (E.D. Va. Jan. 3, 2025) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)); *see Cole v. Group Health Plan*, 105 F.4th 1110, 1114 (8th Cir. 2024) (defining an adverse employment action as a "disadvantageous change to the compensation, terms, conditions, or privileges of employment").

Following *Muldrow*, courts within the Fourth Circuit have found that complaints about management and supervision style do not rise to the level of adverse action. In *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196 (D. Md. 2025), for example, the court ruled that the conduct of supervisors who yelled at and micromanaged the plaintiff did not constitute adverse employment actions. *Id.* at 217–18. The court stated, *id.* at 218: "While perhaps not appropriate behavior by a supervisor in the workplace, these discrete acts did not affect the terms or conditions of Plaintiff's employment." *See also De La Torre v. Fink*, PX-23-3203, 2025 WL 460757, at *7 (D. Md. Feb. 11, 2025) (stating that feeling uncomfortable, irritated, or inconvenienced does not rise to the level of adverse action).

As noted, plaintiff presents numerous claims of discrimination. To illustrate, she asserts that defendant deprived her of training, guidance, and feedback necessary to succeed. *See* ECF 47 at 26. She describes Hendrix as unsupportive. ECF 47-4, ¶¶ 14, 21. She contends that her teaching

hours were reduced and her responsibilities were changed without adequate notice. Moreover, she complains that she was subjected to the PIP and that her contract was not renewed.

Some contentions overlap with others. I address each contention in the course of the Discussion.

When plaintiff began working at the University on August 5, 2019, she had no teaching experience. Rather, she was selected for the position because of her clinical background, which included nine years of experience as a physician's assistant. ECF 42-9 at 2. The University provided some training during plaintiff's transition. "In fall 2019, Dixie Pennington, Simulation Director for the University's Physician Assistant Leadership and Learning Academy (PALLA), reviewed simulation-based training and evaluation with Ms. Wooten . . . ." ECF 42-8, ¶ 13; *see* ECF 42-5 at 53. This "included coaching on simulation case design structure and the development of rubrics and case objectives." ECF 42-8, ¶ 13. In December 2019, "Christine Cestone, Director of the University's Faculty Center for Teaching and Learning (the 'Faculty Center'), taught a session on writing course objectives, learning outcomes, and syllabus structure to Ms. Wooten, Kimberlee Bizzell . . . and Kerry Birney . . . ." ECF 42-8, ¶ 12; ECF 42-5 at 53.

In the Spring of 2020, following plaintiff's negative student evaluations from the previous semester, Hendrix worked with plaintiff to develop a Professional Growth and Development Plan. ECF 42-6 at 52; ECF 42-13 (the "Plan"), at 2; ECF 47-4 ¶ 13. The Plan set out a number of instructional goals as well as strategies to achieve them. ECF 42-13 at 2–3. Plaintiff also registered for the PAEA New Faculty Workshop, but it was cancelled due to the Covid-19 pandemic. ECF 42-6 at 70. During this time, plaintiff, as well as the other instructors, had to adjust to the challenges of moving to a virtual learning environment. ECF 42-4 at 17.

In her Declaration of August 25, 2025, Wooten states: "Dr. Hendrix was not supportive at all, to include demanding I work all five days contrary to my initial work arrangement." ECF 47-4, ¶ 21. She also avers that "[a]ssignments were given with minimal notice, sometimes only a week to prepare" and that on July 25, 2021, Dr. Hendrix asked her to work on her "day off." *Id.* ¶ 14. And, during the Spring and Summer of 2020, plaintiff felt that her workload was not adjusted for her .8 FTE appointment. *Id.*

During the Spring semester of 2020, plaintiff was assigned lectures in Clinical Medicine 2 with lab responsibilities for the Patient Evaluation Lab course. ECF 42-6 at 38. At her deposition, plaintiff asserted: "Cheri [Hendrix] never gave people their work in advance. It was always last minute. So just even assigning the lectures, telling you what you're going to do. You can't prepare for something that you don't have and then you're told at the last minute." ECF 42-6 at 41. Of import, plaintiff acknowledged that Hendrix did this to all professors and that Hendrix's treatment of plaintiff was not unique. *Id.* at 42.

As previously discussed, beginning on April 30, 2021, Hendrix began to write notes concerning plaintiff because of workplace issues. ECF 42-5 at 34; *see* ECF 42-22. Hendrix testified at her deposition: "Every time I had a meeting [with plaintiff], I would finish the meeting and I would write down the highlights of that meeting and what the details were so I wouldn't forget them." ECF 42-5 at 35. She continued, *id.*: "I just kept a running timeline of the notes. Every time I had a meeting, I would just add more notes." As noted, by the Summer of 2021, Hendrix began expressing concern to plaintiff regarding the negative feedback provided by students. ECF 42-22 (Hendrix Meeting Notes); ECF 42-5 (Hendrix Deposition), at 34.

Hendrix's notes from a meeting with plaintiff on July 2, 2021, state, in part, ECF 42-22 at 2:

Went over all course and instructor evaluations received since FA2019. Common themes- unprepared to lecture, disorganization of course/lectures, becomes defensive when asked questions. Her evaluations are the lowest of any faculty since 2018; the majority of her instruction scores less than 3.0 (1-5 scale, benchmark is 3.5). There are areas of improvement in the courses she has been teaching (PHA 122) in and/or directing as I have been mentoring her regularly. I asked about distractions at home and the need to come to the office more often to concentrate on the job at hand- she agreed. Students in every cohort are complaining about her; they have valid concerns passed along to Nicole. Faculty also have valid concerns of her lack of engagement, always arguing and not actively listening, and assuming instead of discovering and working with facts.

Hendrix indicates in the notes that, after providing feedback to Wooten, Hendrix asked plaintiff, *inter alia*, to enroll in a course on communication, refrain from becoming defensive, and adjust her teaching style. *Id*. Additionally, Hendrix wrote: "Nicole will watch me lecture in her course July 19, from 1-5pm and again July 26 or 27 from 8am-noon. I have asked her to evaluate me and will give her a faculty evaluation form to complete." *Id*. at 3. Hendrix also stated: "We have hired a visiting professor Susann Galloway who I will also have mentor Nicole. If there is no improvement, constant confusion or if students continue to complain, I will remove her as the course director of MSPA465 and assign a different faculty to take over." *Id*. And, Hendrix wrote, *id*.: "Nicole will not have course director responsibilities in the FA2021. She is to sign up for PAEA Faculty 101 workshop that she has missed out on 3 times in the past 2 years that I have asked her to sign up each time it is offered."

Moreover, Hendrix lectured in plaintiff's class on July 19, 2021, in order to model teaching behavior for plaintiff. ECF 42-22 at 2. Hendrix wrote in her meeting notes: "Nicole was to meet me around 8am to go over my teaching strategy and to go over her course/labs since her final practicum and history elicitation was coming up- she had questions to go over. Nicole showed up at 12:05." *Id*. at 3. Hendrix also recorded that, during the class, when the students attending virtually stated they had not received a Zoom link, "Nicole became very angry and defensive,

stating she sent it out and that everyone had it." *Id.* at 4. However, when "another student respectfully brought his laptop to her to show none of them had received her link, she became more agitated which [Hendrix] calmed down. [Plaintiff] blamed her laptop and that the students need to pay more attention." *Id.* (alteration added).

Hendrix claimed that plaintiff could not answer students' questions about future course assessments. *Id.* Noting that plaintiff had received direct feedback from other faculty on failing to provide information to the students, Hendrix commented, *id.*: "I have now seen first-hand her defensive, argumentative classroom behaviors the students and other faculty have been complaining about."

According to Hendrix, plaintiff was assigned a series of mentors throughout her employment, beginning with Shani Fleming in the Fall of 2019. ECF 42-5 at 12–15. Plaintiff's mentors also included Galloway, a visiting professor, who conducted a peer review of plaintiff on September 1, 2021, as requested by Hendrix. ECF 42-26 at 2 (Teaching Effectiveness Evaluation); ECF 42-27 (Galloway Deposition), at 8. After watching plaintiff's lecture, Galloway gave plaintiff a score of 20 out of 40. ECF 42-26 at 2. Galloway's notes state, *id.*: "The lecture lacked energy (monotone). Instructor tried to be engaging by asking questions this is good, but did not afford adequate time for the student to respond."

On October 6, 2021, Hendrix met with plaintiff and Kimberlee Bizzell, a Medical Director at the University who was also assigned to mentor plaintiff. ECF 42-25 at 3; ECF 47-4, ¶ 5. At the meeting, the University placed plaintiff on a formal PIP. *See* ECF 42-28; ECF 42-6 at 55; ECF 47-4, ¶ 5. The PIP set forth various areas for plaintiff to improve and set benchmarks for her performance. ECF 42-28 at 2. The PIP provided, in part, *id.*:

Personal communications:

- Communication and conflict resolution- must improve communication with students and colleagues in program. Becoming angry, argumentative, and raising your voice to colleagues and students will stop immediately. Defensiveness and blaming others must stop immediately. Dr. Hendrix to assign a conflict resolution course through HR.
- Must give 2-3 day advanced notice for meetings where you are responsible for lab content.
- Adjunct instructors must be on the same page every week, which means you need to be in every lab section observing each week. All instructors responsible for course content you assign must know how to execute what you need and must all do so the same way so students are not confused.

Course Preparation:

- Must start preparing for class lectures and lab content well before the date they are to occur. This allows you to answer questions students may raise during your discussions.
- Lecture material must be delivered in an organized manner and posted at least the day before the lecture or lab.
- All course/lab expectations and grading criteria must be stated to the students with clarity well before an assignment is due. This should always occur on day one of the course of lab, but must be reiterated during the semester.
- Adjunct instructors must be on the same page every week, which means you need to be in every class observing each week if you are the course director. All instructors responsible for course content you assign must know how to execute what you need and must all do so the same way, to include grading, so students are not confused.

Guidance:

- You will take direction in MSPA 512 starting October 5, 2021 from Theresa Neumann. Colleen Ohm will no longer be giving direction to you in that course.
- SOF evaluations must be at 3.5 of [sic] above by the end of the fall semester: knowledge of course material, presented content effectively, provided helpful feedback, assignments/grades posted in a timely manner, course conducted in an organized manner.
- You need to ask for assistance from the Faculty Center for Teaching and Learning to help you meet the above expectations in course/lab preparation. Dr. Hendrix will contact Dr. Cestone for guidance, then you will be expected to follow through with that guidance.
- You will enroll in and take the PAEA Faculty Workshop offered this fall.

In November 2021, Wooten attended the new faculty workshop, a condition mandated by her PIP. *Id.* Plaintiff complains that Caucasian colleagues were provided with the opportunity to attend the new faculty workshop first. ECF 47-6 at 69. Yet, in her Declaration (ECF 47-4), plaintiff lists "attending faculty development workshops, trainings, and conferences . . ." as an "unreasonable expectation" of her responsibilities. *Id.* at 1–2.

Plaintiff also contends that her reduction in lecturing hours constitutes an adverse action. ECF 47 at 26. However, the reduction in hours generally corresponded with opportunities for training. *See* ECF 42-5 at 10.

Hendrix appointed Neumann as course director for Clinical Medicine 1 for the Fall semester of 2021, and plaintiff assumed the role of lab coordinator. Hendrix and Neumann arranged Clinical Medicine 1 at that time with the idea that plaintiff, as lab coordinator, could learn from Neumann's teaching. *See* ECF 42-23 at 3; ECF 42-5 at 17, 43.

Neumann wrote to plaintiff on August 25, 2021, and asked plaintiff to "pick 1 - 2 hours of content that you want to deliver for Derm (1 hour each day), Eye (1 hour), and ENT (1 hr); I will be delivering the rest while you learn." ECF 42-23 at 3. Neumann continued, *id.*: "Please do not give a quiz during the 1st hour; your goal is to deliver content. If you want to schedule a post-lecture, non-graded quiz, please send me the content for review. I will be evaluating your teaching and giving you constructive criticism to help you improve." Plaintiff responded to Neumann's email that day, writing, *id.* at 2: "I am not trying to be a problem. But if you have changed my responsibilities and I am no longer teaching these lectures as discussed. [sic] Why did I have to switch my day off?"

On August 27, 2021, following a meeting about plaintiff's concerns as expressed in the August 25, 2021 Email Chain, Hendrix wrote an email to Neumann and plaintiff. ECF 42-24.

Hendrix explained that she had "completed [her] investigation regarding the changes in the MSPA 512 course" and "[i]n [her] thorough investigation over many days, [she] failed to discover any [changes]." *Id.* at 2. Hendrix wrote that she "found only small tweaks that were directed to better facilitate learning and create more consistent instruction while taking the entire semester and all courses being taught into consideration." *Id.* She continued, *id.*: "Tweaks here and there to a course follow a typical process- there is nothing wrong with small changes that are just that- tweaks to improve the overall flow and content of the course."

Hendrix also clarified the role and responsibilities of Neumann as "course director," emphasized that Neumann and plaintiff must follow the "chain of command," and directed Neumann and plaintiff not to "interface with one another in this course." *Id.* at 2–3. Instead, Hendrix wrote: "Colleen, [PAP's] academic coordinator, has agreed to work with you Nicole; she will take Theresa's direction and inform you, and you will carry out that direction without argument." *Id.* at 2. Hendrix concluded: "I will not tolerate insubordination, accusations, bullying or negativity of any kind. I forwarded Ombuds and Workforce Mediation links to you both to utilize if you so desire." *Id.* at 3.

At Hendrix's deposition, she explained why she and Neumann wanted plaintiff to teach only an hour of the material, stating, ECF 42-5 at 17: "Let's break it down into smaller pieces, and instead of teaching three and four-hour chunks, just teach an hour, just take it slower. And we can guide [plaintiff] on how to teach it. It's complex information, but let's break it down."

Neumann recalled at her deposition, ECF 42-5 at 10:

So, you know, if I go back and think about how she did overall, it seems like if she was in the classroom, they didn't like her teaching style, they let her know it. That reflected on her student opinion forms. We would try to help correct those kinds of things, try to give her mentoring in how to do a little better job. But start out slow and then work our way into something that was a little bit more of a workload that was equitable with everybody.

Although plaintiff argues that her reduction in lecture hours was an adverse action (ECF 47 at 26), she also complains that she suffered an adverse employment action because she was asked to provide three additional one-hour lectures.  *Id.* at 19.  Plaintiff alleges a lack of training and support from the University.  But, the record completely contradicts the assertion.  Moreover, the record makes clear that the reduction in plaintiff's lecturing hours occurred in connection with UMB's effort to improve plaintiff's teaching.  In any event, plaintiff does not identify any harm that she suffered because of the reduction of her lecturing hours.

With respect to the request that plaintiff conduct three additional lectures, this alleged adverse action stems from an incident that occurred on October 7, 2021, the day after the University placed plaintiff on a PIP.  On that date, Neumann assigned three more hours of lecture to plaintiff via email.  ECF 42-25 at 6 ("October 7–12, 2021 Email Chain").  Neumann wrote, *id*: "Please take a look at the Gastroenterology topics and let me know which content you would like to deliver (~ 1 hour) for Monday, 10/18, Weds 10/20, and Mon 10/25. I will build my content based on your preference/strength."  In response, plaintiff said, in part: "I will plan to lecture GI on those dates, however, it is a bit frustrating to now receive an email asking me to prepare 3 additional lectures."  *Id.*  Explaining the pressure she felt to improve, plaintiff also wrote, *id.* (alteration added): "I am being closely evaluated by the staff and students. The only way to do better in this area is to have proper preparation and adequate notice of assignments. . . . [T]here needs to be a limit on so many last minute changes."  Plaintiff copied Neumann's request from the August 25, 2021 Email Chain, in which Neumann asked her to pick certain topics on which to lecture, none of which included Gastroenterology.  *Id.*

41

Neumann responded, *id*. at 5: "This was discussed in a meeting with you, me and Cheri.[10] Cheri asked what content areas you were teaching in Clin Med, and, as written in the course schedule/syllabus, you were going to do a portion of Derm, Eye, ENT and GI in accordance with content areas previously taught." Neumann continued, *id.*: "Thus, I don't believe this is totally new information, but I'm sorry if you feel that it is. It has been published since the beginning of the semester, as well." Notably, Neumann offered to deliver the content herself if it was too much for plaintiff, explaining that she only meant the email to be a reminder of a previous assignment and not a new one. *Id.*

Wooten acknowledged that she had previously taught the relevant content area but noted that the syllabus had been changed via Blackboard, an online platform, and plaintiff had neither been informed of the updated syllabus by email nor provided with an updated version of it. *Id* at 4. Plaintiff also said, *id*: "The meeting with you, Cheri, and myself was about our treatment to each other. . . . I am a very good employee, I am not unorganized, I can follow directions, and I do the work that is provided to me and more."

Hendrix answered on October 12, 2021, stating, in part, *id.* at 3:

I need to remind you that refusing to take on very brief lecture(s) that you have done before negates your workload. You don't need weeks to prepare for a one-hour lecture you've given in the past. We went over workload Thursday, October 6 with Kim present, and you were placed on a performance improvement plan (PIP) at that time. One of the items you must improve upon, very clearly outlined in the PIP, is your personal communication and conflict resolution.

Yesterday's communication from you was not good. I have found a conflict resolution course for you to attend through UMB and will assign it to you today.

On the same date, plaintiff replied, in part, *id.* at 2:

---

[10] In the October 7–12, 2021 Email Chain, Hendrix clarified that the meeting occurred on September 1, 2021. ECF 42-25 at 4.

Cheri because you are not apart [sic] of the meetings then it [sic] unfair that you provide insight as to what happened. You try to help with the situation, but what I am experiencing is one sided behaviors. You are not holding Theresa [Neumann] accountable for what she is doing to me, which at this point appears purposeful. I have asked for months my responsibility for this semester. It was changed at the very last minute. I had no idea exactly what topics or when I was lecturing up until the morning of the start of class. This is unacceptable. Theresa made it very clear the systems (but not the topics) she would like me to lecture this semester, which I have in writing. Theresa NEVER asked me to do GI.

Wooten continued, *id.*:

Regarding Colleen: The only reason I brought up Colleen because she was the one I was directed to speak with regarding Clin Med. I never asked for Colleen to be the mediator. I was told she was the mediator. It is a bit frustrating that you make calls or we come to an agreement about something, then it gets twisted as if this is something I wanted/did, and as a result I get in trouble behind it. I actually asked to utilize UMB's mediation services, which appears to have been declined and/or ignored.

And as stated, contrary to what is said or believed about me, I am actually an amazing teacher and an even better person/mentor. The numbers show that. You did give all the credit to Theresa and Colleen; however, the areas in which the students have excelled in, I did teach them as well. The class of 2022 is amazing, but I taught their Foundations Course, I taught dermatology, ophthalmology, ENT, GI, GYN, and OB in Clin Med, I taught in Mrs. Lee lab, I taught their Clinical Correlations Course without an issue or decline in performance. I am very much a valuable asset to this program.

This is truly becoming a bit much for me and now affecting my mental health and wellbeing. Please lets [sic] just move forward working towards improving on all accounts.

Further, plaintiff complains that the University condoned the use of racial slurs against her by students, and she maintains that this amounts to an adverse action. ECF 47 at 26. But, the only evidence to which plaintiff points in support of this assertion is a discussion board post from the Spring of 2021. ECF 42-5 at 37; ECF 42-36 ("Message Board Post"). Both plaintiff and Hendrix confirmed in their depositions that the Message Board Post was submitted by a student, but neither provided the name of the student. ECF 42-6 at 54; ECF 42-5 at 44–45. The version of the Message

Board Post provided to the Court by plaintiff does not include the student's name, which appears to have been whited out.  *See* ECF 42-36 at 2.

The comment described the student's approach to certain tests and added, *id.* at 2: "I mostly didn't study for them and the worst score I got was an 88 on OB/GYN because Wooten is a fucking idiot who couldn't teach us anything."  ECF 42-36.  Upon seeing the post, another instructor immediately sent it to Hendrix, and it was removed from the site.  ECF 42-5 at 37.  Hendrix then reprimanded the student who posted the comment and two other students who were involved and issued a "professional warning" to all three.  *Id.* at 38.

Further, with respect to the "series of adverse employment actions" that plaintiff allegedly suffered, plaintiff complains that she "was reprimanded for attending a funeral of a relative. . . Plaintiff was also written up for trying to defend herself against Ms. Neumann."  ECF 47 at 25–26.  The comment that plaintiff perceives as a reprimand is found in an email of August 4, 2021, from Neumann, stating, ECF 53-8 at 4: "You have already taken off for July 23rd and August 6th; I've worked around your schedule for those dates. Everyone else has picked up the slack."  Plaintiff objected and, in a follow-up email discussing Neumann's request for plaintiff to work on a certain date, Neumann wrote, *id.* at 3: "I had not even gotten to that point when you asked for the day off for your cousin's funeral. I would never keep you from going to a funeral, so I never asked."

"Courts in the Fourth Circuit have held that a letter of reprimand does not constitute an adverse employment action for purposes of a discrimination claim unless the reprimand was tethered to an adverse impact on the terms and conditions of the plaintiff's employment."  *Credle*, 2025 WL 27827, at *8; *see Magassouba*, 773 F. Supp. 3d at 218 (finding that reprimands are actionable under Title VII only when the reprimands "could have resulted in adverse notes in Plaintiff's personnel file, which in turn could have limited his opportunities for professional

growth in the [Prince George's Police Department]"); *see also Downer v. Prince George's Cnty. Bd. of Educ.,* BAH-21-1618, 2024 WL 3277563, at *9 (D. Md. July 2, 2024) (stating that a performance evaluation constitutes an adverse employment action only when the employer uses the evaluation as a basis to alter the terms and conditions of employment).  An employment action that "merely causes an employee irritation or inconvenience" is not an adverse employment action. *Spriggs v. Public Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Neumann's expression of frustration with plaintiff did not change any terms, benefits or conditions of plaintiff's employment.  Therefore, the incident does not constitute an adverse action for the purpose of establishing a prima facie case of race discrimination.

In sum, the allegations addressed above do not amount to discriminatory conduct and/or do not meet the standard for an adverse employment action.  Nor has plaintiff shown any harm regarding an identifiable term or condition of her employment.  *Muldrow*, 601 U.S. at 354–355.

Simply put, Wooten has not presented a triable issue of race discrimination on the grounds reviewed above.  *See*, *e.g.*, *Downer*, 2024 WL 3277563, at *11 (finding that plaintiff failed to present a triable issue with regard to claim of race discrimination based on denial of training that was provided to Caucasian employees because plaintiff did not adduce any evidence to suggest that "he was denied EMS training on account of his race. . . ").

I turn to discuss plaintiff's placement on the PIP and the non-renewal of her employment contract, which are both adverse actions.

### D.

The University states that Wooten "cannot establish an adverse action, except to the extent she relies upon her placement on a PIP or her nonrenewal."  ECF 42-1 at 23.  But, the University maintains that "summary judgment for the University is still warranted because the record is

replete with evidence that [Wooten] was not meeting the University's legitimate performance expectations." *Id*. UMB asserts, *id.*: "From the outset of her appointment in August 2019, Ms. Wooten struggled with classroom management, clarity of instruction, and professional conduct." Defendant adds, *id.*: "These deficiencies continued throughout her tenure, as students regularly reported that she came to class unprepared, failed to adequately answer questions, responded defensively to students, and appeared disengaged." Defendant notes that "student comments were deeply critical of plaintiff," ECF 53 at 10, and it highlights that plaintiff "received some of the lowest evaluation scores of any faculty member in the PA Program since 2018, which were well below both the Program benchmark and the institutional average." ECF 42-1 at 23. Furthermore, the University contends that plaintiff resisted supervision, did not make any meaningful progress, and refused to review student evaluations. *Id.* at 24.

Defendant concludes: "The undisputed evidence shows that Ms. Wooten was placed on a formal PIP in October 2021 due to ongoing concerns regarding her institutional effectiveness, including poor student evaluations, communication breakdowns, and lack of progress despite mentorship and support." *Id.* at 27. Moreover, it contends: "The University's decision not to renew [Wooten's] contract was based on her continued failure to meet performance expectations, culminating in an unprofessional outburst during a meeting with the Vice Dean of the Graduate School. *Id.*

Wooten insists that she met defendant's legitimate job expectations. ECF 47 at 26. Claiming that "[s]he received a lot of positive comments," *id.*, plaintiff asserts, *id.* at 27: "Many of her evaluation [sic] were above the benchmark, even under COVID conditions." She also posits that she "complied with all instruction made by her supervisors . . ." and denies that she was "argumentative." *Id.* Further, she states, *id.*: "While Plaintiff was always firm and direct, she does

46

not recall yelling at anybody." Additionally, plaintiff contends "there was a group of students, a clique, who repeatedly instigated others to write poor evaluation [sic] and wanted to have Plaintiff fired." *Id*. at 27–28. According to Wooten, these unidentified students fabricated complaints against plaintiff and UMB condoned their behavior. *Id*.

In its Reply, defendant asserts: "Ms. Wooten's contention that she met legitimate expectations rests on isolated praise and claims that any shortcomings were due to course design, last-minute changes, or insufficient guidance." ECF 53 at 8. Reiterating that students repeatedly expressed dissatisfaction with Wooten, UMB remarks, *id*. at 10: "Across five semesters, and eleven courses, [plaintiff] fell below the institutional average every time and met the Program's 3.5 benchmark only three times." Further, defendant argues that the "record also refutes Ms. Wooten's claim that she 'complied with all instruction,' 'helped her colleagues,' and 'was never argumentative.'" *Id*. at 11. Additionally, defendant claims that at the time of the PIP, plaintiff's "performance was below expectations, as reflected in subpar ratings, consistent qualitative feedback, and documented professionalism concerns." *Id*. at 12. According to defendant, after the initiation of the PIP, plaintiff's "conduct then deteriorated further, resulting in her yelling at the Vice Dean, reinforcing the Program's concerns and supporting its subsequent action." *Id*. at 10. Defendant posits that, "viewed in the light most favorable to Ms. Wooten, these facts do not create a genuine dispute of material fact sufficient to survive summary judgment." *Id*. at 12.

As mentioned earlier, plaintiff can refer to "evidence that demonstrates (or at least creates a question of fact) that the proffered [work] 'expectation' is not, in fact, legitimate at all." *Warch*, 435 F.3d at 517. In particular, an employee may establish that she was meeting her employer's legitimate work expectations by: (1) pointing to concessions by her employer that she was performing satisfactorily at the time of dismissal; (2) offering evidence of prior satisfactory

performance reviews; or (3) providing expert testimony as to the employer's performance expectations and an analysis of her performance in light of those expectations. *King*, 328 F.3d at 149–50.  Ordinarily, however, a plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [plaintiff] was meeting [the employer's] expectations." *Id.* at 149 (alterations added).

Plaintiff has not cited any concessions from UMB or any positive performance reviews from the administrators.  Nor did she provide expert testimony.  *King* is instructive.  There, the Court concluded that the plaintiff, a Black, male teacher, did not present a prima facie case of race or sex discrimination and did "not overcome his employer's asserted legitimate motive in terminating him . . . ." *Id.* at 147.  As to the prima facie case, the Court said that plaintiff failed to show that his "job performance was satisfactory at the time of his discharge." *Id.* at 148.  Of relevance here, the defendant offered substantial evidence that the plaintiff did not, in fact, meet legitimate performance expectations. *Id.* at 149.  Plaintiff's evidence was limited to his own claim that he met expectations and testimony of fellow teachers. *Id.*  The Court concluded that this was insufficient. *Id.*

In *Warch*, 435 F.3d at 518, the Fourth Circuit examined a contention that the plaintiff met the employer's legitimate work expectation by ranking highly in a single category.  It stated that a plaintiff cannot "create a genuine dispute concerning h[er] prima facie case by cherry-picking the record to find one isolated instance where [s]he arguably performed." *Id.*

Indeed, occasional "positive performance reviews at some point during . . . employment is not sufficient to establish [that plaintiff] was meeting her employer's legitimate expectations." *Lee v. Mkt. Am., Inc.,* WLO-18-1046, 2022 WL 475326, at *6 (M.D.N.C. Feb. 16, 2022) , *aff'd,* 2022 WL 4128849 (4th Cir. Sept. 12, 2022); *see Brinkley v. Harbour Recreation Club,* 180 F.3d 598,

609–10 (4th Cir. 1999) (noting that improvement in some areas does not constitute sufficient evidence to raise a genuine issue of material fact on the issue of whether plaintiff was meeting defendant's legitimate expectations), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (stating that evidence of acceptable performance in one area did not establish acceptable performance overall); *Smith v. Martin*, JCD-10-248, 2011 WL 3703255, at *5 (E.D.N.C. Aug. 23, 2011) ("[S]poradic praise does not create a genuine issue of material fact concerning whether [plaintiff] was meeting his employer's legitimate expectations when he was terminated.").

*Williams v. Horry-Georgetown Tech. Coll.*, 26 F. Supp. 3d 519 (D.S.C. 2014), also provides guidance.  There, the plaintiff was employed as an adjunct faculty instructor for four semesters.  *Id.* at 523.  During the fourth semester, plaintiff was terminated.  *Id.*  The plaintiff asserted that her termination was due to her age and race, and in retaliation for filing a charge of discrimination.  *Id.* at 523.  But, the court found that the plaintiff "fail[ed] to point to any relevant evidence showing that she was actually meeting her employer's legitimate expectations at the relevant time period."  *Id.* at 528.

Notably, students had complained about the plaintiff's classroom management, her tardiness, and her lack of focus during class.  *Id.* at 540.  In addition to "complaints from students and unfavorable student evaluations regarding Plaintiff's performance," the defendant "felt Plaintiff evidenced an unwillingness to cooperate with its efforts to assist in improving her performance."  *Id.*  Although the plaintiff claimed her student scores were better than average and that the ratings were based on incomplete data, the court noted that the plaintiff did not point to any evidence to support the claim.  *Id.*  The district court awarded summary judgment to the employer because the plaintiff failed to meet legitimate work expectations.  *Id.* at 541; *see also*

*Wakefield-Brace v. Greenwood Sch. Dist. 50*, MGL-KFM 16-2750, 2017 WL 9286975, at *10 (D.S.C. May 25, 2017) (ruling that plaintiff had not proved she met legitimate expectations of defendant because of inability to counter a series of negative reviews), *report and recommendation adopted*, MGL-16-2750, 2017 WL 2569846 (D.S.C. June 14, 2017).

*Awah v. Bd. of Educ. of Baltimore Cnty.,* WMN-09-1044, 2010 WL 3002016 (D. Md. July 27, 2010), *aff'd,* 408 F. App'x 687 (4th Cir. 2011), is also instructive. In that case, the plaintiff worked as a teacher at a high school and alleged that his resignation was the result of intolerable working conditions stemming from discriminatory treatment by the school's staff members. *Id.* at *1. In evaluating whether Awah could establish a prima facie case of discrimination, the court wrote: "Mr. Awah provides no evidence that he was meeting Defendant's legitimate expectations of his job performance." *Id.* at *2. The court pointed to the defendant's "numerous detailed evaluations of Mr. Awah's teaching demonstrating that his performance was unsatisfactory"; "several e-mails directed to Mr. Awah regarding missed appointments with his designated mentor and his failure to present four detailed lesson plans each week"; and "complaints from students regarding his teaching and behavior in class." *Id.*

In response to the defendant's evidence, the plaintiff "argue[d] that the evaluations and planning sessions were ruses to prove that he was a bad teacher so that they could terminate him, but that he otherwise would have received satisfactory evaluations." *Id.* But, the court stated, *id.* at *3 (citing *King*, 328 F.3d at 149):

> Notably absent from Mr. Awah's arguments . . . is objective evidence that Plaintiff was meeting the legitimate expectations of his employer. A plaintiff's conclusory assertions as to his performance and unsubstantiated allegations fail to establish that he was performing the job at a level that met his employer's legitimate expectations and are not enough to withstand summary judgment.

Here, Wooten has not provided any evidence to demonstrate that she met the University's legitimate work expectations. Indeed, plaintiff's student evaluations show otherwise. On July 2,

2021, after Hendrix met with plaintiff, she noted that plaintiff's "evaluations are the lowest of any faculty since 2018; the majority of her instruction scores less than 3.0 (1-5 scale, benchmark is 3.5)." ECF 42-22 at 2. At plaintiff's deposition, she acknowledged that "professors have a benchmark of at least hitting 3.5." ECF 42-6 at 34.

As noted earlier, the parties do not explain the methodology for the student evaluations. But, as shown previously, the exhibits are largely self-explanatory. They are a compilation of scores derived from the students' individual evaluations. ECF 42-10 at 2–5; ECF 42-11 at 2–5; ECF 42-12 at 2–5; ECF -14 at 2–5; ECF 42-15 at 2–5; ECF 42-16 at 2–5; ECF 42-17 at 2–5; ECF 42-18 at 2–5; ECF 42-19 at 2–5; ECF-42-20 at 2–5; ECF 42-21 at 2–5.

Although I previously reviewed the structure of the evaluations, it is useful to review again a representative example. Each summary evaluation includes a variety of statements for which students score their level of agreement, from one to five. For the evaluations for plaintiff's Fall 2019 Psychiatric Medicine course, one statement is as follows: "The instructor demonstrated knowledge of the course material." Plaintiff received responses from fifteen students. ECF 42-10 at 2. Each of those fifteen students provided plaintiff with a score between one and five, reflecting the extent of agreement with the statement. *Id.* Plaintiff's Course Average for this particular statement was 2.20, which was calculated by the University by taking the average of the fifteen student responses. *Id.* In comparison, the Institution-Wide Average for this specific statement was 4.67. *Id.*

Another statement on the evaluation is: "Give your instructor an overall rating for the course." ECF 42-10 at 4; ECF 42-11 at 4; ECF 42-12 at 4; ECF -14 at 4; ECF 42-15 at 4; ECF 42-16 at 4; ECF 42-17 at 4; ECF 42-18 at 4; ECF 42-19 at 4; ECF-42-20 at 4; ECF 42-21 at 4. I shall refer to this as the "overall instructor rating."

With regard to plaintiff's overall instructor rating, she surpassed the benchmark score of 3.5 on only three occasions out of eleven evaluations pertaining to five semesters. ECF 42-10 at 4; ECF 42-11 at 4; ECF 42-12 at 4; ECF -14 at 4; ECF 42-15 at 4; ECF 42-16 at 4; ECF 42-17 at 4; ECF 42-18 at 4; ECF 42-19 at 4; ECF-42-20 at 4; ECF 42-21 at 4. Moreover, as depicted in the chart below, even when plaintiff met the course benchmark, she never met the Institution-Wide Average for her overall instructor rating for each course. *Id.* Notably, plaintiff does not challenge the accuracy of the Institution-Wide Average or the benchmarks.

| Semester | Course | Wooten's Course Average | Institution-Wide Average |
|---|---|---|---|
| Fall 2019 | Clin Med 1 | 3.40 | 4.36 |
| Fall 2019 | Clin Med 1 Lab | 3.67 | 4.36 |
| Fall 2019 | Psychiatric Medicine | 2.23 | 4.36 |
| Spring 2020 | Clin Med 2 | 3.30 | 4.42 |
| Spring 2020 | Patient Eval Lab | 2.85 | 4.42 |
| Summer 2020 | Foundations of PA Practice | 2.42 | 4.34 |
| Summer 2020 | Foundations of PA Practice Lab | 3.50 | 4.34 |
| Fall 2020 | Clin Med 1 | 3.12 | 4.35 |
| Fall 2020 | Clin Med 1 Lab | 3.20 | 4.35 |
| Spring 2021 | Clin Med 2 | 3.55 | 4.44 |
| Spring 2021 | Patient Eval Lab | 3.42 | 4.44 |

Nonetheless, plaintiff insists, based upon a handful of positive student comments, that she was not underperforming. ECF 47 at 27. UMB has a mountain of evidence to the contrary. Most of the student evaluations uniformly provide negative scores across various classes throughout plaintiff's employment. *See* ECF 42-10; ECF 42-11; ECF 42-12; ECF 42-14; ECF 42-15; ECF 42-16; ECF 42-17; ECF 42-18; ECF 42-19; ECF-42-20; ECF 42-21.

For plaintiff's first semester in the Fall of 2019, plaintiff co-taught a class titled Clinical Medicine 1 with Neumann and other faculty and solely taught the Clinical Medicine 1 Lab. ECF 42-5 at 8–9; ECF 42-6 at 17–19. She also facilitated Psychiatric Medicine, a course that consisted of prerecorded lectures developed and taught by an adjunct faculty member. ECF 42-5 at 8–9; ECF 42-6 at 19–21. In addition to playing the recorded content, plaintiff answered students'

questions, delivered two lectures of her own, and facilitated discussions.  ECF 42-5 at 8–9; ECF 42-6 at 19–21.

Plaintiff received below average student evaluations in all three courses.  ECF 42-10 (Fall 2019 Psychiatric Medicine Evaluations); ECF 42-11 (Fall 2019 Clinical Medicine 1 Evaluations); ECF 42-12 (Fall 2019 Clinical Medicine 1 Lab Evaluations).  In the student evaluations for plaintiff's Fall 2019 Psychiatric Medicine course, plaintiff received an overall instructor rating of 2.23, as compared with the Institution-Wide Average of 4.36, and below the PAP benchmark of 3.5.  ECF 42-10 at 4; 42-6 at 33.

Students' comments (ECF 42-10 at 6–9) were generally negative and included reports of plaintiff discouraging questions, responding with hostility to student engagement, expressing disinterest, and even falling asleep.  *Id.* ¶¶ 2, 13, 14, 22, 30, 32, 33, 39, 48, 57, 58. The comments included the following: "In this context, though, it is very difficult to discern any qualities that I liked about this professor."  *Id.* ¶ 1; "If Wooten was assisting in teaching the class, I would not recommend anyone to take it[.]" *Id.* ¶ 30; "I do not feel like this instructor provided a positive learning environment." *Id.* ¶ 33; "I would not recommend Wooten as a professor." *Id.* ¶ 39; "It is clear professor Wooten is very intelligent, but I don't feel it is appropriate for her to be teaching this course. . . . Many interactions between her and the class felt combative." *Id.* ¶ 42.

Wooten performed better in her evaluations for Clinical Medicine 1 and Clinical Medicine 1 Lab.  ECF 42-11; ECF 42-12.  She received an overall instructor rating of 3.40 for Clinical Medicine 1, which was still below the benchmark of 3.5 and the Institution-Wide Average of 4.36. ECF 42-11 at 4.  In Clinical Medicine 1 Lab, for her overall instructor ratings, plaintiff surpassed the benchmark with a score of 3.67, but remained below the Institution-Wide Average of 4.36. ECF 42-12 at 4.

In the lecture segment of the course, the students' comments often related to plaintiff's interactions with students.  ECF 42-11 at 6–9, ¶¶ 11, 21, 30, 36, 39.  Students' comments included the following: "She can work on the way she talks to people. She often can come off as demeaning/confrontational."  *Id.* ¶ 21; "Professor Wooten can come off as defensive. . . she sometimes becomes more aggressive to students and makes the learning environment one where no one feels comfortable asking questions." *Id.* ¶ 30; "Wooten seems to be happy to be here and to teach, but she gets quite defensive sometimes. . . . . she allows her frustration to come out in a way that does not seem to be conducive to our learning."  *Id.* ¶ 36; "I think that Prof [sic] Wooten has the potential to be a great instructor, but her aggressive and defensive response creates a hostile learning environment."  *Id.* ¶ 37.

Students' comments in plaintiff's Clinical Medicine 1 Lab Course were generally less negative and more focused on her status as a new professor.  *See* ECF 42-12 at 6–7, ¶¶ 2, 7 11,15, 19, 22.  For example, students wrote: "Again, I understand prof. [sic] Wooten is new and just needs a little more confidence."  *Id.* ¶ 2; "I believe as this instructor gets more experience, she will become a more effective instructor."  *Id.* ¶ 22; "I feel that the lab needed more clarity surrounding expectations, and honest, clear adjustments when necessary."  *Id.* ¶ 19.

Generally, plaintiff notes that the evaluations contained "a great variety of comments." ECF 47 at 10.  Understandably, she focuses on the positive student comments she received with respect to the Fall 2019 Clinical Medicine Evaluations and the Fall 2019 Psychiatric Medicine Evaluations.  *Id.* 47 at 26-27.  However, almost all of the positive comments that plaintiff uses as support are drawn from question fields are phrased so as to elicit positive responses, such as "What did you like best about the instructor's teaching" and "Explain why any of the items above that were used in the course helped your learning."  *See, e.g.*, ECF 47-11 at 6–8.  Out of the eleven Fall

2019 Clinical Medicine 1 comments cited by plaintiff, ten were derived from those two fields. ECF 47 at 10; ECF 42-11 at 6–8, ¶¶ 1, 6, 16, 20, 26, 27, 32, 40, 45, 47.  The last comment cited by plaintiff concerned a suggestion for how she could improve.  ECF 42-11 at 6, ¶ 20.

To support plaintiff's contention that she received positive feedback from her Fall 2019 Psychiatric Evaluations, plaintiff highlights a comment that stated, ECF 42-10 at 6, ¶ 1:

> I think Professor Wooten genuinely want [sic] to be a good professor, and she seems like a kind and reasonable human being . . . . I think that she is a victim, in some ways, of this class's structure. She did not have to be familiar with the material that was taught and she could not be in control of what was tested.

However, the student also said, *id.*:

> [Wooten] did not take an active role in teaching and it seemed that she was not interested in being the 'face' of this course. I may have found redeeming qualities if she had taught this subject entirely on her own and taken more responsibility for our learning. In context, though, it is very difficult to discern any qualities that I liked about this professor.

Plaintiff also seems to ignore other negative and critical responses for other fields. *See* ECF 42-11 at 6–8, ¶¶ 2, 3, 5, 9, 11, 18, 20, 21, 30, 31, 36, 39, 41, 43, 44, 46, 51, 52, 54.  Although comments in 2019 referenced plaintiff's inexperience, others reflected frustration with her defensiveness and disorganization.  *See, e.g., id.* at 7, ¶ 36 ("I think Prof Wooten has potential to be a great instructor, but her aggressive and defensive response creates a hostile learning environment.")

According to Wooten, "the majority of critiques were about the poor structure and design of the course for which Plaintiff was not responsible."  ECF 47 at 26.  But, many comments were aimed directly at plaintiff and her performance.  *See, e.g.,* ECF 42-10 at 6–9, ¶ 30 ("If Wooten was assisting in teaching the class, I would[ not] recommend anyone to take it[.]"); *id.* ¶ 33 ("I do not feel like this instructor provided a positive learning environment"); *id.* ¶ 39 ("I would not recommend Wooten as a professor."); *id.* ¶ 42 ("It is clear professor Wooten is very intelligent,

but I don't feel it is appropriate for her to be teaching this course . . . Many interactions between her and the class felt combative."); *see also id.* ¶ 2 ("She fell asleep in class MULTIPLE times.")

Wooten's student evaluations for her classes in Spring 2020 also raised concerns. ECF 42-14 (Spring 2020 Clinical Medicine 2 Evaluations); ECF 42-15 (Spring 2020 Patient Evaluation Lab Evaluations). Plaintiff received an overall instructor rating of 3.30 in Clinical Medicine and a 2.85 in the Patient Evaluation Lab. ECF 42-14 at 4; ECF 42-15 at 4. Both of plaintiff's overall instructor ratings were below the institutional benchmark of 3.5 and the Institution-Wide Average for that semester of 4.2. ECF 42-14 at 4; ECF 42-15 at 4.

The comments from the Clinical Medicine 2 Evaluations were quite critical of plaintiff's teaching style and demeanor, as illustrated by the following remarks, ECF 42-14 at 6–9, ¶¶ 15, 16, 26, 28, 29, 31, 34, 35, 37, 40, 42, 43, 44, 49, 54, 55: "Professor Wooten did not facilitate my learning. . . Also, she does not like when students ask questions. She gets very frustrated and most of the time cannot provide us with a proper explanation." *Id.* ¶ 15; "Please consider finding a new professor. An overwhelming majority of students found her to show no desire to teach, no concern for student learning, and most importantly, a significant lack in understanding of medicine." *Id.* ¶ 26; "I never got the indication that Professor Wooten wanted to be there for us or teach us. It just seemed like another thing for her to do to fill her time. She did not connect with any students and acts very incompetent." *Id.* ¶ 29; "[C]lin med with wooten [sic] was very unhelpful. it [sic] was a complete waste of time, energy, and learning. i [sic] learned the majority of the content she taught on my own time or by classmates helping me understand, asking questions to Professor Wooten is pointless." *Id.* ¶ 31; "I would absolutely not bring this instructor back under any circumstances. Every single other instructor we have had during our academic year (including guests) were much better than this instructor." *Id.* ¶ 35; "We do not trust this professor." *Id.* ¶ 38; "Her level of

instruction is significantly lower than any other instructor in the program. . . . To put it bluntly, she is not a very good instructor." *Id.* ¶ 43.

Similarly, the comments for the Spring 2020 Patient Evaluation Lab course were generally not favorable, as the following examples illustrate. *See* ECF 42-15 at 6–9, ¶¶ 5, 12, 14, 15, 23, 24, 25, 27, 28, 32, 35, 36, 38. "Professor Wooten is a very wonderful person, and I'm sure a competent provider but every lecture she teaches (in clinical medicine and patient eval lab) is a struggle to learn from." *Id.* ¶ 12; "I truly believe Prof. Wooten is trying to teach us, but I believe that she would benefit from some mentoring (especially with her lecture style)." *Id.* ¶ 15; "I have struggled to learn from Professor Wooten's teaching style. I found most of her explanations confusing and not straight forward as a student that is eager to learn." *Id.* at 7; "[P]rofessor Wooten has little regard for her students, does not respect our time or hers for that matter, doesn't give us adequate notice up for any class time changes . . . and literally has no idea how to teach students or have a desire to interact with us." *Id.* ¶ 25; "Please please please re-evaluate Nicole Wooten as a professor at the graduate level.  My education is suffering because I am not learning from top notch faculty" and noting that, plaintiff is "a very nice person" . . . but "a cancer to the learning environment. . . ." *Id.* ¶ 28; "Students (including myself) struggle to learn from this instructor." *Id.* ¶ 32; the "transition online was good just because I did not have Wooten as an instructor. She means well, but she is not cut out for teaching at the college level or beyond." *Id.* ¶ 35.

As mentioned, plaintiff's original employment term was to expire on June 30, 2020, unless renewed by the University.  ECF 42-7.  Notably, despite the negative evaluations from students through June 2020, as reviewed above, the University retained plaintiff as a faculty member.

Thereafter, in the Summer of 2020, plaintiff taught the Foundations of Physician Assistance Practice Course. ECF 47-4, ¶ 17.  Plaintiff had only one week to prepare. *Id.* However,

Hendrix described it as "the easiest course. It's the bread and butter of our profession." ECF 47-5 at 64. During the course, Neumann adjusted the syllabus for the class, and asked plaintiff to change the syllabus and course material. ECF 47-4, ¶ 17.

Plaintiff's overall instructor rating, based on student evaluations, remained low. *See* ECF 42-16 (Summer 2020 Foundations of Physician Assistant Practice Evaluations); ECF 42-17 (Summer 2020 Foundations of Physician Assistant Practice Lab Evaluations). For the lecture course, plaintiff's overall instructor score was 2.42, which was well below both the benchmark and the Institution-Wide Average of 4.34. ECF 42-16 at 4.

The student comments were largely negative, particularly regarding the lecture component of the course. ECF 42-16 at 6–9. The following student comments are illustrative: "This class was fairly easy and mostly out of the textbook, if this had been a harder class I would have been very worried about passing with Professor Wooten." *Id.* ¶ 3; "I would be very concerned to take a more difficult class from this professor in the future." *Id.* ¶ 6; "Course is necessary, professor needs to go." *Id.* ¶ 7; "I would recommend this course, with a different instructor." *Id.* ¶ 12; "I would respectively [sic] select a different instructor for this course. Thankfully I believe I have done well due to my background of being a scribe, but I still had difficulty with the course instructor. I really liked Professor Wooten, but I don't think this class is good for her to teach as this sets the tone for our PA foundation." *Id.* ¶ 28; "I do not recommend [Wooten] at all, unless you want unclear instructions and chaos." *Id.* ¶ 30; "I am really disappointed in the lack of communication. . . .[T]he professor has lectured to us from her bed, which was described to us as unprofessional behavior." *Id.* ¶ 31; "She was an AWFUL instructor. . . . The class chaos caused me more anxiety than the material did." *Id.* ¶ 33; "I think Professor Wooten is really nice, I just had a really hard time following her teaching style." *Id.* ¶ 37; "I felt that I did not learn a lot from Professor Wooten. I

learned a lot more from the textbook, youtube, and my lab instructors and fellow students." *Id.* ¶ 55; "I would recommend the course because it is the foundations [sic] of our practice. . . I would not recommend Professor Wooten at all and would highly suggest replacing her as the instructor of this course." *Id.* ¶ 69; "I would recommend the course, but with a different professor." *Id.* ¶ 75; "You can tell Professor Wooten is a knowledgeable PA and I am sure she is great in practice but she is a highly ineffective professor and I would not recommend she teach this course again." *Id.* ¶ 78; "With the utmost respect, I am frustrated with [P]rofessor Wooten's teaching style." *Id.* ¶ 84.

In the smaller lab component of the Foundations of Physician Assistant Practice course, plaintiff taught five students. ECF 42-17 at 2. The students' comments were mixed. ECF 42-17 at 6, ¶¶ 5, 8, 10, 13. One student wrote: "Instructor is new and does not seem comfortable teaching the course." *Id.* ¶ 5. Another student wrote: "I would 100% recommend her as a lab instructor, but perhaps not an online lecture instructor." *Id.* ¶ 10. A third wrote, *id.* ¶ 13: "Professor Wooten gave great feedback one on one during lab sessions and made sure to explain things until we completely understood."

The Fall of 2020 did not show marked improvement. Plaintiff co-taught Clinical Medicine 1 with Neumann and facilitated the Pediatrics course taught by adjunct faculty. ECF 42-4 at 15; ECF 42-6 at 49, 50. Her evaluations registered instructor scores that were below the 3.5 benchmark, with overall instructor ratings of a 3.12 in the lecture component of the course and a 3.20 in the lab component. ECF 42-18 (Fall 2020 Clinical Medicine 1 Evaluations), at 4; ECF 42-19 (Fall 2020 Clinical Medicine 1 Lab Evaluations), at 4. Plaintiff's scores of 3.12 and 3.20 were lower than the Institution-Wide Average, which was 4.35 during this semester. ECF 42-18 at 4. In both the lecture and the lab materials, students continued to report concerns. ECF 42-18 at 6–8, ¶¶ 2, 6, 7, 9, 10, 16, 26, 30, 31, 40, 44, 49, 50, 51; ECF 42-19 at 6, ¶¶ 2, 8, 11, 14, 16.

The following student comments are noteworthy: "Unfortunately, on the topics that Professor Wooten lectured, I did not feel very confident in the material and had to entirely teach myself using multiple resources and sleepless nights." ECF 42-18 at 6–8, ¶ 2; "I think that teaching topics in clinical medicine must be challenging, however it felt as if Professor Wooten was never prepared for class and was never confident on the material." *Id.* ¶ 6; "Professor Wooten's professionalism needs to be drastically improved. It is much better when we are taught by lecturers who know the material. . . ." *Id.* ¶ 31; "I would recomend [sic] the course, not the instructor." *Id.* ¶ 42; "I really do not think that teaching is for Professor Wooten, it appears that she just does not care about being prepared for lecture or care about our learning as students. There is a stark difference in the effort provided by Professor Wooten and the other faculty." *Id.* ¶ 51.

Comments concerning the lab course were mixed, as illustrated by the following, ECF 42-19 at 6: "Professor Wooten. . . would often be sitting on her phone while we practiced independently." *Id.* ¶ 2; "I was not a fan of this professor last semester but she has really turned around in my eyes." *Id.* ¶ 3; "She seemed unprepared . . . ." *Id.* ¶ 11; "Professor Wooten was more helpful in labs and would be better with above mentioned changes." *Id.* ¶ 12.

In the Spring of 2021, plaintiff again taught Clinical Medicine 2. ECF 42-20 (Spring 2021 Clinical Medicine 2 Evaluations); ECF 42-21 (Spring 2021 Patient Evaluation Lab Evaluations). Plaintiff received overall instructor ratings of 3.55 for the lecture and 3.42 for the lab. ECF 42-20 at 5; ECF 42-21 at 5. These were below the 4.4 Institution-Wide Average the semester but near the institutional benchmark of 3.5. ECF 42-20 at 5.

Wooten received mixed reviews. One student wrote, ECF 42-20 at 6, ¶ 2: "It felt like Professor Wooten was not knowledgeable on the subject but that she had simply just read the same chapters in the book that we had." The student added: "It also feels that Professor Wooten has no

confidence teaching or controlling a classroom which honestly just makes for an uncomfortable learning environment." *Id.* Another student wrote, *id.* ¶ 9: "Lectures were difficult to follow, and sometimes concepts were explained incorrectly. Many things were presented in a very confusing way."

For the lab component of the class, several students provided positive comments: "Professor Wooten is amazing! I have seen so much improvement in her teaching since over the summer." ECF 42-21 at 6–9, ¶ 2; "I thought she did a great job in this class." *Id.* ¶ 51; "I like that Professor Wooten is easy going and gives good feedback on patient evaluation." *Id.* ¶ 10. Nevertheless, most comments were critical of Wooten. *See id.* ¶¶ 5, 8, 11, 13, 16, 17, 18, 35, 37, 42, 54, 55.

The following remarks are illustrative. "There were times it was obvious [plaintiff] not paying attention to the discussions we were having about the case. It felt as though she did not do her research on some of the cases before expecting us to do them." *Id.* ¶ 5; "Least knowledgeable [sic] of the professors, constantly confused from listening to her contradict herself." *Id.* ¶ 8; "We could get better than 'average' professors for our next batch of students." *Id.* ¶ 15; "This course was so disorganized and majority of time spent in class was a poor use of my time." *Id.* ¶ 16; "Professor Wooten was clearly in over her head with this course." *Id.* ¶ 17; "It was clear Professor Wooten was not preparing before class as much as the other professors." *Id.* ¶ 42; "The only think [sic] I like about Professor Wootens [sic] teaching is that she responds to emails in a relatively timely manner. Otherwise I am highly disappointed." *Id.* ¶ 55.

When plaintiff learned that she was not meeting the University's benchmarks, her response was simply to stop reading feedback. Indeed, plaintiff testified at her deposition that, after her first semester, she stopped reviewing her student evaluations because she "didn't want to" and "just

didn't think that they were going to change." ECF 42-6 at 43–44. Moreover, during her meeting with Vice Dean Lilly and Hendrix on October 25, 2021, plaintiff acknowledged that she had not reviewed her most recent evaluations. ECF 42-29, ¶¶ 2, 6. But, plaintiff claims that the recent evaluations were not available to her prior to the meeting. ECF 47-4, ¶ 29. When asked at her deposition why she did not review student feedback, plaintiff answered, ECF 42-6 at 44: "I told you I don't think the students like me. I told you the students consistently misbehaved in the class. I told you the students consistently challenged me. I told you the students treated me unfairly. They constantly questioned my knowledge." Plaintiff continued: "[N]o matter what I did – no matter what I did was the result going to change. That was just my mentality." *Id*. at 45. Lilly noted his concern that plaintiff was unaware of the complaints. ECF 42-29, ¶ 7.

As indicated, plaintiff focuses on a handful of positive comments from the student evaluations to support the contention that she met legitimate expectations. ECF 47 at 27–28. But, when viewed in full, rather than in isolation, the student evaluations show that plaintiff consistently performed below institutional benchmarks.

In any event, whether some students made favorable comments is largely beside the point. Perhaps the students who made negative comments about Wooten were too critical. But, this is not a matter of whether the students were right or wrong, or whether their views were sound or unfounded. The students are the proverbial customers of the University. Their views would understandably matter to the University. The fact that some students wrote favorable comments did not require the University to overlook the many negative comments directed at Wooten. The University was entitled to decide, on the basis of repeated student criticism of plaintiff, as well as her performance ratings, which were well below average, that Wooten did not meet the University's legitimate job expectations.

A party opposing summary judgment "cannot create a genuine issue of material fact merely by arguing that his performance was sufficient." *Irani v. Palmetto Health*, 767 F. App'x 399, 419 (4th Cir. 2019) (affirming summary judgment for employer because "numerous members of the faculty and hospital staff were concerned about [plaintiff's] job performance").  It is the perspective of the decision maker, not the employee's self-perception, that matters in measuring legitimate expectations.  *King*, 328 F.3d 149.

Moreover, the record shows that Wooten's supervisors were concerned about her job performance for an extended period of time, attempted to address the issue in various ways, renewed her original contract despite performance issues, and eventually placed plaintiff on the PIP.  The University could have declined to renew plaintiff's contract in June 2020, but it did not do so.  Instead, UMB continued to work with plaintiff, so as to enable her to improve.  There is no indication that UMB provided more or better assistance to White professors whose performance also did not meet expectations.

Ultimately, UMB decided not to renew Wooten's contract.  Vice Dean Lilly explained in his Affidavit, ECF 42-29, ¶ 12: "Although [plaintiff's] relationship with her supervisors appeared to be strained, I perceived the underlying cause to be legitimate oversight and feedback related to her performance."

Plaintiff's poor teaching performance was an issue.  *Id.*  But, it was not the only issue, as Dean Lilly indicated.  *Id.*  Hendrix's notes include several references to contentious interactions between plaintiff and her co-workers. ECF 42-22 at 2; 4–5; 6.  Plaintiff disputes that she was argumentative, and counters the contention with a specific reference to one "small disagreement" she had with Galloway.  ECF 47-2, ¶ 56.  The record is to the contrary.

Both the August 27, 2021 Email Chain and the October 7–12, 2021 Email Chain invoke requests for official mediation by plaintiff and Hendrix.  ECF 42-24; ECF 42-25.  In October 2021, Hendrix, plaintiff, and Bizzell, one of plaintiff's mentors, met to discuss the email exchange involving plaintiff and her reaction to the request from Neumann that she lecture on Gastroenterology topics, as discussed previously.  ECF 42-22 at 4–5.  Hendrix's notes from the meeting of October 15, 2021, state, in part, *id.*:

> October 15, 2021. Met with Nicole and Kim at Kim's request over an email dispute between Theresa and Nicole. Nicole wanted to know what I was doing with Theresa and why I always sided with her. She kept arguing and trying to prove Theresa is out to get her by being purposefully malicious. I explained that was not the case, that Theresa- and everyone who read Nicole's email (Colleen, Teresa [sic], Susann, and me) did not like the tone. Theresa told her it was an inappropriate email and should not have been sent to the rest of the faculty. One of the items Kim and I are working on with Nicole is her ability to communicate with faculty, staff and students, one of the items on her PIP.

Further, Hendrix wrote, *id.* at 5:

> I told her I feel very harassed by her and it has come to a head. After 90 minutes of Nicole stating she will not back down and she WILL argue and refuse to take direction, she wanted to know her options moving forward. I stated I had contacted Dr. Lilly and requested the 3 of us have a meeting as he is well aware of her insubordination. Her options are to get along with Theresa, stop the "tit for tat" emails that are digging a deeper hole for herself, start preparing for spring and summer course now, and sop [sic] refusing direction. I asked again what her passion was- travel- and asked her if she had sought work as a traveling PA. She had not (we had discussed this over the summer). She insists she is a great instructor, always punctual, follows directions (after she just said she will continue to refuse direction), is a great mentor to the students and the reason for her poor student evaluations is because of Theresa. She wanted to know what I was doing about Theresa, and I told her as much as I cannot tell Theresa what I do with Nicole, I will not tell Nicole what goes on with Theresa. She did not like that answer.

In addition, Hendrix's notes state, *id.*:

> I will either have Flav, Nicole and I meet, or also add Theresa, as this needs to stop. [Wooten's] bickering has gotten out of control to where she thinks she is being picked on purposely. She continues to have arguments with Susann [sic] Galloway as she refuses to take direction or advice and wants to argue every point. (These two yelled at one another during the recent clinical call back days activities at the

SOP October 1 where I had to intervene to get them to stop. Nicole refuses to listen to anyone and argues every point/directive and becomes highly defensive if it is something she does not want to do or does not understand). I talked with Kim afterward and let her know that Theresa too has been advised many times to control emotions, temper and last minute changes, to which she has done very well with all semester. Kim agreed Theresa has been very professional. Kim will continue to mentor Nicole she also shared with Nicole that sending harassing emails to me must stop, that she may disagree with directives, but not to argue them and to refrain from tit for tat emails with Theresa. She did disclose that she warned Nicole not to send the emails that stated she would go over my head if the antagonizing didn't stop- Nicole is the antagonizer [sic], not Theresa, and that threatening her direct supervisor was not a wise thing to do. I agreed.

Plaintiff's supervisors saw Wooten's behavior as enough of an issue such that it was incorporated as part of her PIP. ECF 42-28. The section on improving personal communication and conflict resolution states, *id.*: "Becoming angry, argumentative, and raising your voice to colleagues and students will stop immediately."

Notably, as to the meeting with Vice Dean Lilly on December 3, 2021, both Hendrix and Lilly claim that plaintiff raised her voice. ECF 42-5 at 21; ECF 42-29, ¶ 13. Hendrix testified at her deposition that during the meeting, plaintiff "screamed" at Lilly. ECF 42-5 at 21. In his Affidavit, Lilly avers, ECF 42-29, ¶ 13: "When I shared my perspective, Ms. Wooten became irate and screamed at me, accusing me of not listening." At plaintiff's deposition, she did not entirely contradict this account, stating, ECF 42-6 at 62: "And I may have raised my voice or been – no, I don't know if I raised my voice. Maybe I was just direct, and – because they weren't hearing me."

Bizzell did not attend the meeting. But, she recalled plaintiff reporting that the meeting "didn't go so well" and said that plaintiff told her that "she raised her voice, and she was told that she was being insubordinate." ECF 42-31 at 7.

At best, the record shows that plaintiff did not know whether she raised her voice at Lilly. But, two other attendees claimed that she did. And, a third person was personally told by plaintiff that she had, indeed, "raised her voice."

65

Plaintiff also alleges that she was subjected to racially motivated slurs. Plaintiff points to the Message Board Post where a student posted a vulgar criticism of plaintiff.  ECF 42-5 at 37; ECF 42-36.[11]

The post (ECF 42-36) is certainly crude.  But, it does not contain any language that suggests it was racially motivated.  Nor is there any basis to support plaintiff's conclusion that students "posted these slurs publicly on-line in order to humiliate Plaintiff."  *Id.*

Moreover, upon seeing the post, another instructor immediately sent it to Hendrix, and it was removed from the site.  ECF 42-5 at 37.  Hendrix then reprimanded the student who posted the comment, as well as two other students who were involved, and issued a warning to all three. *Id.*  The University's swift action in removing the post and disciplining the students refutes plaintiff's unsupported suggestion that "defendant quietly condoned this behavior."  *Id.*; *see* ECF 42-29, ¶¶ 6,7.

In sum, the evidence in the record overwhelmingly demonstrates that the alleged incidents of racial discrimination are not supported by the record and/or that plaintiff was not subjected to an adverse action as to these matters.  Moreover, the University has clearly demonstrated that plaintiff did not meet the University's legitimate performance expectations.

## E.

Plaintiff maintains that the University treated similarly situated employees more favorably than it treated her.  Plaintiff identified Caucasian colleagues Kerry Birney, Colleen Ohm, and Teresa Rogers as similarly situated.  *Id.* at 30.  But, plaintiff has not demonstrated "that all of the

---

[11] As noted, the post stated, ECF 42-36:  "Wooten is a fucking idiot who couldn't teach us anything."

relevant aspects of h[er] employment situation were nearly identical to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).

Such a showing "would include evidence that the employees dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)) (alterations in *Haywood*). "The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). Additionally, "[t]he most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (alteration added).

Plaintiff has not provided the Court with any evidence that her proposed comparators are "similarly situated in all respects." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (quoting *Mitchell*, 964 F.2d at 583) (internal citations omitted). Indeed, Wooten makes no attempt to show that the comparators are similarly situated. Instead, she merely states, ECF 47 at 30: "All of the following employees shared the same position description as Plaintiff, and were all professors with a similar level of supervision by Ms. Hendrix and Theresa Neumann." She adds, *id.*: "Therefore, they qualify as comparators." Bare, conclusory assertions are insufficient to defeat summary judgment. *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 500 (4th Cir. 2015).

Wooten's most substantive discussion regarding these purported similarly situated employees concerns Birney. ECF 47 at 30–32. Birney, a former colleague, who is White, began

working at the University in April 2019, a few months before plaintiff joined the faculty.  ECF 42-37 (Birney Deposition), at 8.  Plaintiff focuses on the slight differences as to the non-renewal of Birney's contract. As the University points out, however, Birney experienced treatment nearly identical to that of plaintiff.  ECF 42-1 at 27.

Birney was placed on a PIP approximately one year before plaintiff.  ECF 42-5 at 20.  And, on February 12, 2021, Vice Dean Lilly informed Birney that her contract would not be renewed and that her employment at the University would expire on June 30, 2021.  ECF 42-33 at 2. Plaintiff acknowledges that Birney was criticized and that ultimately her contract were not renewed.  ECF 47 at 32.  Wooten does not demonstrate that Birney's PIP or non-renewal was somehow more favorable.  Indeed, Birney's non-renewal letter is almost identical to that for Wooten, save for the work reassignment.  ECF 42-32; ECF 42-33.

Plaintiff complains that Birney was permitted to work at a vaccination clinic until the end of her contract with the University.  ECF 47-4, ¶ 31.  She contends that, in contrast to Birney, she was isolated and was not permitted to interact with faculty, staff, or students.  *Id.*  Wooten does not explain the legal significance of the actions by UMB that followed either non-renewal decision.

Wooten also claims that, "[u]nlike Ms. Birney, Plaintiff was deprived of the access to the University's systems which hindered her career in research."  ECF 47 at 21 (citing ECF 47-6 at 4). But, plaintiff produces no substantive differences or evidence, other than her own Declaration.

In *Irani*, 767 F. App'x 399, the Fourth Circuit rejected the appellant's attempts to rely on comparators who were purportedly similarly situated, because there was "a significant distinguishing factor between Appellant and each of the comparators he presented. Specifically, Appellant's infraction was not a single misstep, but a part of a larger pattern of patient care issues." *Id.* at 420.  The Court observed that none of the alleged comparators had disciplinary histories

comparable to that of the appellant. *Id.* at 420–421. It emphasized that "a single violation presents an entirely different issue than a pattern of violations that have not been remedied despite continuous counseling." *Id.*

Here, plaintiff repeatedly received poor student evaluation scores. Moreover, plaintiff had a hostile relationship with her supervisors. Although Birney apparently had a hostile relationship with Neumann and Hendrix, there is no evidence that she suffered from poor evaluations from her students. ECF 42-5 at 53. To the contrary, Hendrix testified at her deposition that Birney's teaching scores exceeded those of plaintiff. *Id.*

Plaintiff also points to the fact that Birney "was moved from didactic to clinical" due to Birney's conflict with Neumann. ECF 47 at 31. Birney testified at her deposition, ECF 42-37 at 10: "I was removed from some of my teaching responsibilities kind of rather abruptly without explanation. And I was kind of made to feel that I was being disciplined on multiple occasions without any kind of formal acknowledgement that that was occurring." Although plaintiff attempts to portray Birney's reassignment as preferential treatment, Birney viewed the transfer as "one element that led to the decision to not renew [her] contract." *Id.* at 16. Plaintiff does not explain why such a transfer constitutes favorable treatment.

Birney also made it clear that the Program had organizational issues. She said, *id.* at 13: "It was commonplace in that department, even at the time I was there, that teaching assignments would be given sometimes at the last minute with very little lead time and with very little direction or support on how it would be accomplished." Indeed, plaintiff testified at her deposition that lecture assignments were made at the last minute to all professors. ECF 42-6 at 42. In other words, the University may have had management issues, but they were not predicated on race, nor was plaintiff the only one who received belated assignments.

If anything, plaintiff's reliance on Birney strengthens defendant's position.  Birney, a White colleague, was treated less favorably than plaintiff—she received higher teaching scores, and she worked at the University for less time than plaintiff, meaning that, unlike Wooten, she was not given time to improve.

Birney began her employment with the University in April of 2019.  ECF 42-37 at 7.  In February of 2021, less than two years after beginning her employment, Birney was notified of her non-renewal and relieved of her teaching duties for the remainder of her contract.  *Id.* at 7–8.  Her contract was set to expire on June 30, 2021.  ECF 42-33 at 2.  In contrast, plaintiff's employment began on August 5, 2019.  At least one contract was renewed, despite negative student evaluations.  Plaintiff was informed of the non-renewal of her contract on April 1, 2022, but remained employed by the University until June 30, 2022.  ECF 42-6 at 63, 66.  In other words, plaintiff worked at the University for nearly three years before her contract was not renewed, whereas Birney's tenure lasted only about two years.  Birney testified that the treatment that she received from Neumann and Hendrix was "very consistent" with the way that they treated Wooten.  ECF 53-9 (Supplemental Transcript of Birney Deposition), at 9.

Plaintiff has not established that Birney was similarly situated or that Birney was treated more favorably.

## F.

As detailed earlier, plaintiff must establish a prima facie showing of race discrimination.  She has failed to do so.  And, defendant has offered overwhelming evidence of a legitimate, performance-based reason for the non-renewal of plaintiff's contract.  Even assuming a prima facie case, the focus shifts to the third step under *McDonnell Douglas*: Plaintiff must present evidence from which a factfinder could conclude that defendant's proffered reason for plaintiff's non-

renewal was pretextual, and that unlawful race discrimination was the true reason. *See, e.g.*, *Adams*, 640 F.3d at 560. To do so, plaintiff must prove "both that the reason was false, and that discrimination was the real reason." *Jiminez*, 57 F.3d at 378 (internal citation omitted).

Plaintiff contends that the University's actions in placing her on a PIP and then failing to renew her contract are pretextual. Her claims are almost entirely duplicative of her argument that the University discriminated against her by placing her on a PIP and by not renewing her contract. ECF 47 at 33. Indeed, plaintiff writes, *id.*: "In looking at a pretext issue, this Honorable Court may also consider the facts which Plaintiff presented to establish her *prima* facie case of discrimination." *Id.* Plaintiff introduces no other evidence of pretext. *Id.*

The University points to plaintiff's consistently poor performance scores and her conflict with supervisors, including Vice Dean Lilly. ECF 42-19 at 6–7; ECF 42-5 at 52; ECF 42-29, ¶ 14. Based on plaintiff's repeated underperformance and her difficulties with supervisors, the University has certainly offered a legitimate nondiscriminatory reason for instituting a PIP and not renewing plaintiff's contract.

Again, to establish pretext, plaintiff must prove by a preponderance of the evidence "*both* that the reason was false, *and* that discrimination was the real reason." *Adams*, 640 F.3d at 560 (emphasis in original); *see Reeves*, 530 U.S. at 143. Notably, a plaintiff always bears the "ultimate burden of establishing that the defendant discriminated against her 'because of' her [protected status]." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (alteration added). "It is for that reason that the final stage of the *McDonnell Douglas* framework has also been described as the point at which its **'presumptions and burdens . . . disappear, and the sole remaining issue is discrimination *vel non*.'"** *Parker v. Children's Nat'l Med. Ctr., Inc.,* 2025

WL 1540954, at *3 (4th Cir. May 30, 2025) (per curiam) (*citing Hill*, 354 F.3d at 285) (cleaned up) (boldface in *Parker*).

"A conclusory allegation of racial discrimination coupled with employment disputes does not create a plausible claim under Title VII." *Harris v. Esper,* JKB-18-3562, 2019 WL 5423768, at *7 (D. Md. Oct. 23, 2019) (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000)). Courts within the Fourth Circuit have regularly found that allegations alone fail under the pretext prong. *See*, *e.g., Akpan v. Holy Cross Health, Inc.*, GLS-23-2810, 2025 WL 2616656, at *19 (D. Md. Sept. 10, 2025) (granting summary judgment to defendant because "there is no admissible evidence in the record that Defendant's proffered legitimate nondiscriminatory reason was manufactured after-the-fact to conceal unlawful discriminatory animus"); *Ajisefinni v. CliftonLarsonAllen, LLP,* DLB-19-3284, 2022 WL 17082367, at *5 (D. Md. Nov. 18, 2022) (granting summary judgment to defendant because plaintiff "has offered no evidence that the reason she was fired—poor performance—was pretext for discrimination"), *aff'd*, 2023 WL 4700997 (4th Cir. July 24, 2023); *Brown v. OMO Grp., Inc.,* DCN-14-02841, 2017 WL 1148743 (D.S.C. Mar. 28, 2017) (awarding summary judgment to defendant because plaintiff "includes no specific cites to the record to refute the emails, memoranda, and deposition testimony . . . to support an inference that OMO's explanation was pretextual.").

In *Holland v. Washington Homes, Inc.,* 487 F.3d 208 (4th Cir. 2007), the Fourth Circuit determined that summary judgment for a defendant "may be appropriate if a 'plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Id.* at 215 (quoting *Reeves*, 530 U.S. at 148). Courts consider "the probative value of the proof that the employer's explanation is false." *Holland*, 487 F.3d at 215 (quoting *Reeves*, 530 U.S. at 149).

The *Holland* Court affirmed summary judgment in defendant's favor because, "[a]side from [plaintiff's] denials as to the threats," which it accepted as true, "nothing in the record supports an inference that [the decisionmaker's] explanation was pretextual" or that the decisionmaker did not believe plaintiff had threatened another employee. *Holland*, 487 F.3d at 215.

Viewing the evidence in the light most favorable to Wooten, she has not established that the University's actions were pretextual. To the contrary, the record shows that, from the outset, plaintiff's performance was problematic, she was regarded as contentious, yet the University invested time and effort to assist plaintiff in her performance. She began her employment with a one-year contract, yet it was renewed for two years, at a time when the University was aware of substantial student criticisms of plaintiff's teaching, and notwithstanding Wooten's below-average performance scores.

Plaintiff has not introduced any evidence that suggests that her employers discriminated against her because of her race. The PIP and the eventual non-renewal of plaintiff's contract were each grounded on a legitimate, nondiscriminatory basis. Plaintiff's effort to highlight some positive student comments does not overcome the volume of negative feedback about her teaching or her fractious relationship with her supervisors.

Wooten's claims of the University's discriminatory intent are diminished by the fact that Hendrix and Lilly were responsible for hiring plaintiff in May of 2019, and her contract was renewed at least once. A "strong inference exists that discrimination was not a determining factor for the adverse employment action taken by the employer where the hiring and firing took place close in time and involve the same decision makers." *Bing*, 959 F.3d at 619 n.9; *see Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there

is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer . . . .").

As stated earlier, it is clear that Wooten consistently failed to meet UMB's Institution-Wide Averages in her course evaluations and as to the Program's benchmarks. Even if the students were somehow too harsh in their comments, that is a red herring. The University was not required to ignore them, particularly in the absence of evidence that it ignored criticisms directed to White professors.

## IV. Conclusion

In sum, plaintiff has not established a prima facie case of race discrimination. She has provided no evidence to suggest that her race played any role in the University's actions. She has neither demonstrated her satisfactory job performance nor disparate treatment from similarly situated employees outside the protected class. Moreover, the University has produced a wealth of evidence of a legitimate, nondiscriminatory reason for plaintiff's PIP and the non-renewal of her contract. Plaintiff has not shown that the University's legitimate, nondiscriminatory reasons for its actions were a pretext for racial discrimination.

For the foregoing reasons, I shall grant the Motion. An Order follows.

Date:    February 25, 2026                          _____/s/_____
                                                    Ellen Lipton Hollander
                                                    United States District Judge